[Civ. No. 2978. Third Appellate District.—December 10, 1925.]

IRENE ELDRIDGE, Respondent, v. CLARK & HENERY CONSTRUCTION CO. (a Corporation), Appellant.

[1] NEGLIGENCE—STREET EXCAVATION—PRESENCE OF LIGHTED LANTERN —CONFLICTING EVIDENCE—VERDICT.—In an action for damages for personal injuries sustained by plaintiff, while walking along a sidewalk in the night-time, from falling into an excavation which had been made as a foundation for the construction of a concrete curb for a sidewalk, conflicting evidence as to whether there was a lighted lantern or other artificial light at the point on the sidewalk where the accident occurred is for the jury to resolve.

---

1. See 19 Cal. Jur. 727; 20 R. C. L. 166.

[2] ID.—CONTRIBUTORY NEGLIGENCE — PROXIMATE CAUSE—EVIDENCE.— In such action, where plaintiff testified that she stepped across, rather than upon, a board intended as a barrier to the excavation, but which was in fact lying on the sidewalk, because it did not look good to her, the question as to whether plaintiff was guilty of contributory negligence proximately causing her injuries was one entirely within the province of the jury to decide.

[3] ID.—STREETS — SIDEWALKS — KNOWLEDGE OF CONDITION — USE BY PUBLIC.—It cannot be said as a matter of law that one having a general knowledge of the torn-up condition of a street preliminary to and for the improvement thereof has also acquired knowledge of a like condition of the sidewalks paralleling such street, although, in point of fact, such sidewalks are in such a condition.

[4] ID.—TRIAL — IMPROPER QUESTIONS — GOOD FAITH — MOTIVE.—The good faith or good motive of counsel in asking an improper question cannot make it a proper question, but where an improper question propounded to a juror or a witness is thus prompted, it does relieve counsel from the imputation of wilful misconduct in attempting to wrongfully influence the jury.

[5] ID. — INDEMNITY AGAINST LOSS — EVIDENCE — EXAMINATION OF JURORS—NONPREJUDICIAL ERROR.—In an action for damages for personal injuries, conceding that it is error for the trial court to allow the plaintiff to ask the jurors on their *voir dire* a question implying that defendant, at the time of the accident, was indemnified against the payment of any damages which might be assessed against him for injuries to others directly occasioned by his negligence, such error does not result in a miscarriage of justice where the amount assessed by the jury as damages is not disproportionate to the damage done and there is no question under the evidence of the defendant's liability for the injuries sustained by plaintiff.

[6] ID.—PHYSICAL EXAMINATION OF PLAINTIFF—EMPLOYMENT OF PHYSICIAN AT INSTANCE OF CASUALTY COMPANY—IMPROPER QUESTION —NONPREJUDICIAL ERROR.—In such action, although the trial court erred in permitting the plaintiff, over defendant's objection, to ask a physician on cross-examination if he had not been employed by a casualty company to make a physical examination of the plaintiff, nevertheless, considering the entire record—the nature of the injuries sustained by plaintiff and the effect thereof upon her, the pain and suffering she endured because of those injuries, the ample evidence that defendant's negligence was the

cause of her injuries, and the reasonableness of the amount of damages awarded her—it cannot justly be declared that the error involved in the ruling permitting such cross-examination resulted in a miscarriage of justice.

[7] Id.—Verdict—Damages not Excessive.—In such action, it not being inherently improbable that the defendant, in failing to maintain a light and proper safeguards about the excavation as a protection to those attempting to use the sidewalk at that point, was guilty of gross negligence, it would be an unjust invasion of the province of the jury for the appellate court to declare excessive the verdict awarding the plaintiff fifteen hundred dollars for a fractured wrist sustained in falling into the excavation, where, due to the advanced years of plaintiff, her wrist will never regain normal strength and her earning power is therefore lessened, and it was further shown that she was unable to work for several weeks after her injuries and endured pain and suffering continuously to the date of trial, which was more than six months from the time she was injured.

[8] Id.—Elements of Damages — Pain and Suffering — Verdict— Amount of Award — Conclusiveness of. — In personal injury cases, the element of pain and suffering affords no definite or certain criterion by which the amount of damages to be assigned to that item may be ascertained, and the same is often true, in a less degree, of other elements of the several items which it is competent to consider in making the general award; and generally the determination by the jury of the amount which will fairly compensate for the loss sustained must be accepted.

---

(1) 28 Cyc., p. 1506, n. 55.    (2) 28 Cyc., p. 1424, n. 32, p. 1510, n. 71.    (3) 28 Cyc., p. 1422, n. 27.    (4) 28 Cyc., p. 1478, n. 58, 64. (5) 4 C. J., p. 951, n. 75, p. 952, n. 78, p. 957, n. 67, p. 958, n. 72; 17 C. J., p. 1103, n. 46.    (6) 4 C. J., p. 960, n. 9, p. 961, n. 19; 38 Cyc., p. 1509, n. 12.    (7) 17 C. J., p. 1103, n. 46; 28 Cyc., p. 1404, n. 55.    (8) 4 C. J., p. 869, n. 96, p. 870, n. 99; 17 C. J., p. 1087, n. 56.

APPEAL from a judgment of the Superior Court of Sacramento County. Malcolm C. Glenn, Judge. Affirmed.

The facts are stated in the opinion of the court.

Irving D. Gibson for Appellant.

Martin I. Welsh and Robert H. Schwab for Respondent.

---

7.    See 8 Cal. Jur. 839.

8.    See 8 Cal. Jur. 808; 8 R. C. L. 466.

HART, J.—This is an action for damages for personal injuries. The cause was tried by a jury and a verdict returned in favor of plaintiff for the sum of fifteen hundred dollars, and judgment entered accordingly, from which judgment the defendant appeals.

The plaintiff, who at the time she sustained the injuries complained of, and for some time prior thereto, lived separate and apart, though not legally divorced, from her husband, and who was of the age of fifty-nine years, and weighed about 175 pounds, resided at No. 1717½ N Street, in the city of Sacramento. She was compelled to earn her own living, and to do this was required to leave her home and do the variety of duties incident to general housework. When thus engaged she earned fifty cents an hour. For about six weeks prior to the date of the accident she had continuously thus been employed.

The defendant, as its name to some extent implies, is engaged in the business of constructing, reconstructing, paving, and repaving of streets and other public thoroughfares. At the time of the accident the defendant was engaged in "reconstructing, repaving, and repairing Seventeenth Street and alley and installing curbing at a place near the Northeast corner of said street and alley, between N and O Streets, on the line with the easterly sidewalk of said Seventeenth Street," in the city of Sacramento. It should be stated that N Street runs, practically, in a southerly and northerly direction, while the alley referred to runs likewise in an easterly and westerly direction. The work of improving Seventeenth Street, as indicated, had been under way for some days prior to the date of the accident in which plaintiff was injured, and the street was, while undergoing improvement, in a condition in which its general use by the public was not entirely safe or convenient.

On the evening of the twelfth day of May, 1923, near the hour of 8 o'clock, the plaintiff left her home, intending to attend a dancing party at Oak Park, in the city of Sacramento. Walking west from her home until she reached the southeast corner of Seventeenth and N Streets, she turned at said corner and proceeded south on the east side of Seventeenth Street toward P. Street for the purpose of taking

a "P Street" car for Oak Park. As she was in the act of crossing the alley between N and O Streets, she stepped into an excavation, which had been dug as a foundation for a concrete curb for the sidewalk on the northeast corner of the alley, and fell violently to the ground, striking on her left arm, with the result that she suffered an impacted fracture of the right wrist and bruises upon her body and right limb. She remained prone upon the ground until, a very short time after she had fallen, one Thomas Hall, who was sitting on the porch of a house situated near the alley, having heard her groaning, stepped to where she was lying and assisted her to her feet.

The above embraces a general statement of the circumstances under which the accident occurred. The complaint sets forth substantially those facts in appropriate language and the defendant by its answer specifically denies all the material facts thus alleged. The answer also sets up as a special defense contributory negligence on the part of the plaintiff.

Points made for a reversal are: 1. That the evidence shows, as a matter of law, that the plaintiff was guilty of contributory negligence which proximately caused the accident in which the injuries she received were sustained; 2. That the court erred in its rulings allowing certain testimony to be received and also in its rulings upon certain questions propounded to the jurors on their *voir dire* examination; 3. That the verdict is excessive.

The plaintiff, after stating the facts which are comprehended within the above statement, testified that at the time she met with the mishap the night was very dark; that at the place where the accident occurred the darkness was intensified by the existence of trees standing near said place; that there was no light or barrier at the point on the sidewalk in the alley where the accident occurred; that when she reached the alley she stepped off and into the excavation and was thereby thrown to the ground as above described. She stated that, although from the time she was assisted to her feet until she returned home that night she suffered severe pain in her arm, she, nevertheless, attended the dance at Oak Park; that she complained to friends that she met at the dance that her arm was paining her severely and that they advised her to have it bandaged with gauze satu-

rated with arnica; that she sent to the drugstore for these materials and she and her friends placed the bandage around her wrist. She stated that even up to that time she did not realize that any bones in her wrist had been fractured and that while she took part in the dancing it was necessary for her dancing partner to hold her arm at the elbow so that she would be as free from pain as possible. A few days thereafter, she stated, still suffering much pain from her injury, she called on Dr. Cress at the Emergency Hospital in the city of Sacramento and the doctor expressed the opinion, after an examination of her wrist, that the bones therein had been fractured. Upon the doctor's advice she had an X-ray picture taken of the injured wrist and this sustained the opinion of the doctor as to the nature and extent of the injury. The fracture, she stated, seriously diminished her ability to prosecute the occupations in which she had theretofore engaged as means of making her living and that even at the time of the trial the injury had left her wrist and right hand and arm in a condition which made it inconvenient for her to do the amount of labor of the kind to which she was accustomed and which she was able to do prior to the accident. The plaintiff admitted that, prior to the accident, she had a general knowledge that Seventeenth Street, where the accident occurred, was in a "torn-up" condition, although, she stated, she seldom crossed Seventeenth Street when going to any point from her home, and that it was her best recollection that the last time that she crossed said street was several weeks prior to the accident. She also testified that she did not see any wooden barrier around the curbing where she fell. She said that she did see a board "lying right down where I stepped. I stepped over the board. I did not step on it because it did not look good to me—I stepped over it."

Thomas Hall, who, as above stated, assisted the plaintiff in getting to her feet from the ground where she had fallen, testified that he was sitting on the steps of a house on the corner of the alley where the accident occurred on the evening that it happened engaged in conversation with friends; that "there was some noise, something called my attention to a woman down in the alley, I should judge about three feet from the curb, where the curb line runs from the property line; I ran to the woman and assisted her

to her feet, brought her across to the other side of the alley, asked her if she was hurt; she said something about her arm hurting her. When I arrived where the woman was she was making a very feeble effort to assist herself to her feet, to get up, and I helped the woman, got her on her feet and assisted her across the alleyway." He further stated that after a short interval she seemed to have recovered from the shock and proceeded down the street. He further testified that he made an inspection of the condition of the alley immediately after he assisted the plaintiff to her feet and that he saw a board about two inches thick and eight inches wide lying across the sidewalk at the curb, and as near as he could judge about four feet long. He also stated that he saw no lighted lantern at that point, that it was very dark at that part of the alley and that the darkness was made the more so by reason of a number of trees with large and heavy branches and foliage at the alley.

Dr. W. W. Cress, city physician of Sacramento, and as such in charge of the Emergency Hospital of said city, who professionally attended the plaintiff, testified that the principal injury suffered by her was that of an impacted fracture of the large bone in the right wrist. He explained that an impacted fracture is where the ends of the bones are driven together and also stated that such a fracture would be slower to heal with a person of the age of plaintiff than with a younger person. He stated that it was an injury from which much pain would naturally follow; that the plaintiff was attended by him for several weeks, a part of which time was in her visits to the Emergency Hospital and a part thereof at his own private office, where he treated her in his private and not in his official capacity as city physician. He stated that there was a swelling of the wrist; "injury to the soft part, including the blood vessels, and ligaments, tendons and joint structure. With an elderly person," the doctor continued, "there is much more pain, especially with an impacted fracture so close to the joint." The doctor said that in reducing the fracture there was a very good union of the bone and a very good alignment, but not a perfect alignment. He further stated that she "still has some limitation of motion in the wrist"; that the fracture was different from an ordinary one and that while she might be able to use the right arm in the

performance of labor, she would have to be careful not to overuse it, or, as he stated it: "Up to a certain point she can use it, but beyond that it would do harm." He further stated that there was a little deformity in the wrist when the plaintiff was discharged by him which was occasioned by a slight thickness of the wrist joint which, he further stated, goes with cases of that kind. He stated that the plaintiff made eleven visits to his office and on the last visit, which was the thirtieth day of July, 1923, he said to her that there was nothing more that he could do for her at that time. He also stated that he kept her arm in a splint for a period of six weeks.

The plaintiff introduced in evidence an ordinance of the city of Sacramento entitled "An ordinance to prevent the obstruction of streets, alleys and public places in the City of Sacramento . . . and fixing a penalty for the violation of the provisions of said ordinance." Section 6 of said ordinance provided that "any person by whom or under whose direction or by whose authority as principal, or as contractor, or employer, any portion of a public street, sidewalk or alley may be made dangerous, shall be wrecked, and so long as the danger may continue, maintain, around or over the place so made dangerous, a good substantial barrier, or walk which said barrier or walk shall be constructed in such a manner that it shall be with the approval of the building inspector; and there shall be maintained during every night from sunset until daylight, a lighted lantern or lanterns, around the place so made dangerous." It was stipulated by counsel that there was no moon on the evening the accident occurred.

The district manager of defendant testified that a watchman was employed to see that barricades and lights were maintained at night-time on the street while undergoing improvement, such barricades being kept where there were holes or excavations in the street or alley.

The witness Howe, who was in the employ of defendant at the time of the accident as a night watchman at the point where Seventeenth Street was being improved and whose duties were to put out and maintain at night-time lighted lanterns and barricades at places where there were holes or excavations in the street or alley, testified that just before sunset on the evening of May 12, 1923, he

placed and left a lighted lantern reflecting a red light at the point where plaintiff fell; that the lantern was placed at said point because there existed at that time an excavation across the sidewalk portion of the alley which had been dug for the purpose of constructing a cement foundation for a curb. That lantern, he said, was placed in such a position as that it would or could be seen by anyone about to cross the alley. Howe further testified that on his "second round" of inspection, which must have been several hours after he (as he testified) had placed the lighted lantern at the alley, he saw a lady at or near the house standing on the corner of the alley, and that she then informed him that, a short time before, a woman passing along the sidewalk had stepped into the excavation and fallen to the ground.

Two physicians, testifying for the defendant, stated that, a few days before the commencement of the trial of this action, they, one at one time and the other on another and different occasion, examined the injured wrist of plaintiff and found that the injuries she had suffered had been skillfully remedied and that the wrist was in excellent condition; that there was no evidence that the injuries or the effects thereof were permanent, nor did they discover any reason for believing that the plaintiff was, at the times of their respective examinations suffering pain from the injuries she received, although she then complained of suffering pain. One of these physicians, however, stated, as did Dr. Cress, that the fracture had left a slight deformity, due to the thickening of the wrist joint.

[1] The foregoing is substantially all the testimony received at the trial both for plaintiff and defendant. It will thus be seen that upon the question whether there was a lighted lantern or any artificial light at the point in the sidewalk where the accident occurred, the evidence is in positive conflict. In fact, while it is true that the night watchman of the defendant stated that before sunset of the day the plaintiff was injured as described by her he placed a lighted lantern reflecting a red light at the excavation in the alley, he did not say, nor did any other witness testify, that such a light was at said place at the time the accident occurred. It was for the jury to resolve the evidentiary conflict upon that question, and the verdict im-

plies that the jury's conclusion as to that matter was that, when the plaintiff met with the accident, there was no light at the point where thus she was injured. [2] The defendant further insists that the evidence without conflict shows that the plaintiff herself was guilty of negligence which constituted the proximate cause of her injuries for the reason that she was given warning of the unsafe condition of the passageway in the alley before she stepped into the excavation, in that the board above referred to was placed and maintained at or against the excavation for the purpose of preventing just such a mishap as that with which she met, but that without first making the investigation obviously suggested by the danger warning so maintained, she stepped over or across the board from a position of safety "into a place of unknown quality." The evidence was such as to make this question one entirely within the province of the jury to decide. As seen, both the plaintiff and the witness Hall testified that the board near the excavation was "lying" on the ground. From this testimony the jury would have been well within its discretion, as the triers of the questions of fact, in concluding that the board was not, at the time of the accident, in such a position as to suggest danger at or near the point where it had been placed or left, or at any point in the sidewalk ahead of her, and it is to be assumed that they did so find. In fact, such a finding is necessarily implied from the verdict. Certainly, it is very clear, and it may properly be assumed that the jury so found, that the board was not lying over or upon the excavation, since the uncontradicted testimony of the plaintiff was that, observing the board "lying" on the ground, she stepped across or over it and into the excavation. The statement of the plaintiff that the "board did not look good" to her and for that reason she stepped over it is taken by defendant as disclosing want of care on her part, since, as is the argument, the very fact that it did not "look good" to her was sufficient to lead her to believe that there was some dangerous defect in the sidewalk at or near the place where the board was lying, and hence sufficient to suggest to her mind the necessity for an investigation of conditions thereabout before attempting to proceed further; that, having proceeded on her way without making an investigation, she assumed the risk of any injuries which

she might receive through any dangerous defectiveness of the sidewalk. The statement is reasonably capable of different interpretations, in so far as it was intended to express the particular thought in the plaintiff's mind when she conceived it to be safer to step over rather than upon the board. The statement does not necessarily force the inference that the board was placed there as a signal of danger or that its appearance suggested to plaintiff's mind that there was danger ahead of her on the sidewalk, since, as seen, it was lying flat on the ground. Hence, it was for the jury and not for this court to determine what particular thought the plaintiff intended to convey when she said that the board did not "look good" to her and so determine what specific reason induced her to step over rather than upon the board.

It is not clear that counsel for defendant takes the position that the general knowledge, as shown by her own admission, which plaintiff had of the condition of the street itself prior to the accident was sufficient to charge her with knowledge or notice of a like condition of the sidewalk. The cases cited by counsel would seem to imply that such was his contention. Those cases apply the familiar rule that where a person uses a street or sidewalk which his observation, prudently exercised, would inform him was dangerous, he takes the risk of such injuries as may result to him from open and apparent defects such as his observation ought to have detected and avoided. (*Slaughter* v. *City of Huntington*, 64 W. Va. 237 [16 L. R. A. (N. S.) 459, 61 S. E. 155]; *Moore* v. *Huntington*, 31 W. Va. 849 [8 S. E. 515].)" Or, as the rule invoked by defendant is stated in Abbott on Municipal Corporations, section 105: "When the defect is open a traveler must take into consideration this fact, and, if he is injured, through an attempted use of a highway in a notoriously defective and dangerous condition, he is chargeable with contributory negligence."

The case of *Slaughter* v. *City of Huntington, supra,* was where the plaintiff, in the night-time, while a rain was in progress, the night being unusually dark, attempted to use a street which had been plowed and excavated preparatory to the repavement thereof and which was in a dangerous condition for use by reason thereof at the time he made such attempt, having full knowledge of such condition of the street

prior to and at the time he attempted to use it. In such a case, the rule is that it is wholly immaterial whether there are danger signals or warning signs maintained on the excavated street, since such warnings, while required for those of the public having no knowledge of the dangerous condition of the street or sidewalk, are not designed for those who know about the danger, or have sufficient knowledge thereof to put them on their guard or to charge them with the exercise of such an amount of care as the situation in such a case would require. (*Buckingham* v. *Commary-Peterson Co.*, 39 Cal. App. 154, 162 [178 Pac. 318], and cases cited.) [3] But a reply to that position would be and is that it does not necessarily follow from the fact that a street may be torn or plowed up, and is, therefore, unfit for use, preparatory to the contemplated repairs or repavement or reconstruction thereof, that the sidewalk with which it parallels is also likewise to be improved and for that purpose has been put and is in the same condition that the street is in; hence, it cannot be declared as an abstract proposition or as a matter of law that one having a general knowledge of the condition of a street which has been left in a defective condition preliminarily to and for the purpose of the improvement thereof, also, from such general knowledge, has acquired like knowledge of a like condition of the sidewalks paralleling such street, if, in point of fact, such sidewalks are in such a condition, nor can it be held that such knowledge by a person of such condition of a street for the purpose of improvement has the effect of imputing to such person knowledge of a like condition of the sidewalk. It is the statement only of a trite proposition to say that a person having no special interest in the improvement of a particular street, which has been dug up or excavated preparatory to such improvement, might, in passing near or across such street, observe and so acquire general knowledge of the condition thereof and know that it was for that reason unfit for use by the public, and yet not observe or know or even suspect, if such was the fact, that the sidewalks along the street or any part thereof were also to be improved and for that purpose had been and were "torn up" and hence in such a condition as to make it dangerous to those passing or attempting to pass over it. It is doubtless true that, in some cases where a street is repaved or to be repaved, the

sidewalk paralleling it is also to be improved, or a new curb to be installed along the sidewalk, in either of which events the "tearing up" of the sidewalk or the digging of trenches or ditches for the curb is required, but it is also commonly known to be true that there are many instances where streets are improved by a repavement or reconstruction thereof in which there is no necessity for the improvement of and no intention to improve the sidewalks bordering upon such streets or for the installation of new curbs, in which case the sidewalks are left undisturbed or in a condition in which pedestrians may, with the usual safety to themselves, use them simultaneously with the prosecution of the work of repaving or reconstructing the street. It is hence clear that the mere fact that Seventeenth Street was plowed or torn up and in an unsafe condition to be used by the public did not itself necessarily afford ground for the inference that the sidewalks with which it parallels were also in the same condition preparatory to the improvement thereof or that the sidewalks were in any way or for any reason in such a defective condition as to render them hazardous to the personal safety of those attempting to use them.

On taking up the examination of the jurors on their *voir dire*, counsel for plaintiff asked the talesmen, collectively, "if any of you are stockholders in any insurance company that carries any insurance for the Clark & Henery Construction Company, by reason of any personal injuries that might be caused?" to which question objection was made on the usual grounds by counsel for defendant, but overruled by the court. Each of the talesmen returned a negative answer to the question.

Defendant cites a number of cases from this and other jurisdictions as in confirmation of his contention that the above indicated line of examination of the jurors on their *voir dire* was not only improper but prejudicial and compels a reversal. Among the cases so cited is that of *Arnold v. California Portland Cement Co.*, 41 Cal. App. 420 [183 Pac. 171]. The following are the questions propounded to the talesmen in that case:

" 'Now, if you were sworn as a juror, and during the trial of this case, near the end of it, you should learn that the New Amsterdam Casualty Company, one of these surety

companies, was a surety at the time of this accident alleged, or an insurer against any injury to employees, would that in any wise affect your verdict in this case?' Also: 'And if it came to your knowledge, if you were a juror in this case, and it came to your knowledge from any source whatever, that the New Amsterdam Casualty Company was a surety for any injury to the employees of the defendant company at the time of this alleged injury, would that knowledge of that fact in any wise influence your verdict in the case?' ''

The court held that, while ''there is a decided divergence of opinion among the courts of the several states as to the right of counsel for plaintiff in a personal injury action to suggest in any way, in the presence of the jury, that an indemnity insurance company is an actual party in interest,'' held that the conduct of counsel for plaintiff in that case in asking the questions was improper and prejudicial, citing a number of cases, and upon that conclusion ordered a reversal of the judgment. Among other things, the court in its opinion said:

''It is entirely proper for counsel to ask the jurors such questions as may reasonably be necessary to ascertain whether they are free from a bias or interest that may affect their verdict. To this end it is proper for counsel, in good faith, to ask of each juror whether he is interested as an agent or stockholder or otherwise in a specified casualty company. Or he may be asked the broad question whether he is interested in any insurance company insuring against liability for negligence. (*Rinkin* v. *Acker,* 125 App. Div. 244 [109 N. Y. Supp. 125]; *Grant* v. *National etc. Co.,* 100 App. Div. 234 [91 N. Y. Supp. 805].) But counsel must take pains to propound such questions in such a manner as not unnecessarily to convey the impression that the defendant is in fact so insured. It is misconduct on the part of counsel for plaintiff in such actions so to frame his question that it goes beyond what is reasonably necessary to serve the legitimate purpose of eliciting the facts he is entitled to adduce in order to secure a jury free from bias or prejudice, if it is also apparent that the question may fairly be said to have the effect of serving the illegitimate purpose of prejudicing the jury by fixing in their minds the idea that the defendant is protected by insurance against liabil-

ity for negligence. *And if the amount of the verdict is large as compared with the nature of the injuries sustained, or the defendant's liability is a close question, such misconduct is prejudicial and ground for reversal."*

It is readily to be observed that there is some difference between the questions asked the talesmen in the Arnold case and the question likewise asked in the case here. In the former case, the questions were not, as in the case here, whether any of the jurors were stockholders in *any* company "that carries insurance," etc., for the Clark & Henery Construction Co., but, substantially, whether the jurors, should they learn during the course of the trial of the case, or should it come to their knowledge from any source, that a certain named surety company was, at the time of the accident therein involved, a surety for the defendant against any injuries to its employees, would allow that fact in anywise to affect or influence their verdict in the case. The form of the questions propounded in that case itself plainly indicates that the purpose of that line of inquiry was to get before the jury the fact that the defendant therein was not the real party in interest in the defense of the action. This conclusion is sustained by the consideration that the questions so asked were not followed up with an inquiry as to whether any of the jurors were interested as stockholders or otherwise in any or the particular surety company named. It would amount to an unjust imputation against the acumen or good sense of a lawyer to say that the attorney asking those questions would not know that the effect of giving information to a jury in a personal injury case of the fact of the indemnification of the defendant therein by a surety company against injuries caused through his or its negligence would be, if having any such effect at all, to prejudice the defendant's case in the minds of the jury. The very theory upon which the cases have held such an inquiry improper, and, under certain circumstances, prejudicial, is that there is such a strong popular prejudice against surety or other insurance companies that juries trying issues in an action in which it is sought to establish the liability of such corporations are very apt to permit their judgment to be improperly swayed by such prejudice. Another reason given by the cases for the exclusion of testimony in cases of this character disclosing the fact that the

defendant is indemnified by a surety company against liability is that juries, when in possession of such information, may conclude, without real evidentiary justification therefor, that the defendant was led to the exercise of a less degree of care in prosecuting his business, so far as the personal safety of others was concerned, than the law exacts, considering the nature and character of the business. So, as we have in effect stated, it is clear that the questions propounded to the talesmen in the Arnold case could not have been asked in good faith, or, in other words, were asked for no other purpose than to place before the jury the fact, if it was a fact, that the defendant therein was indemnified against the payment of any damages which might be assessed against it by the jury.

Here the question to the jurors was addressed directly to the proposition of whether they were in any way interested in any surety company, and, while it is true that the question also embraced a query as to whether they were stockholders in any company "that carries any insurance for the Clark & Henery Construction Company," thus implying that said company carried indemnity insurance, still, viewing the question as a whole, it is to our minds quite clear that the central purpose thereof was to ascertain whether there existed in that particular any ground for the exercise of a challenge, either for cause or peremptorily, and that the question was, therefore, asked in good faith. [4] Of course, the "good faith" or "good motive" in the asking of an improper question cannot make it a proper question, but where an improper question propounded to a juror or a witness is thus prompted, it does relieve from the imputation of wilful misconduct on the part of the party asking it in that thus he made a purposed attempt wrongfully to influence the jury. But it would be idle to argue that the question to the jurors in this case does not go beyond the restrictive qualification to the right to ask such a question at all pointed out in the Arnold and other cases dealing with the same proposition, for obviously it did. [5] Conceding, however, as well we may, that the question asked in this case was, technically, equally as objectionable as were those asked in the Arnold and other cases in which the identical point has been considered and passed upon, still it does not necessarily follow that the judgment herein should be re-

versed for the error in allowing it. No case has been cited
—indeed, none can be found—which goes to the extent of
holding that where such an examination by plaintiff is al-
lowed, it is prejudicial *per se*. To the contrary, many cases
hold that there are certain circumstances under which such
an examination may properly be allowed, and all the cases
hold that where the allowance of that line of examination
either of jurors on their *voir dire* or of witnesses involves
error, the question whether it is or is not to be deemed to
be of sufficient gravity, in its effect upon the rights of the
defendant, to require a reversal, is dependent entirely upon
the circumstances of each particular case. (See *Arnold* v.
*California Portland Cement Co., supra; Roche* v. *Llewellyn
Iron Works Co.,* 140 Cal. 563 [74 Pac. 147].) In the Ar-
nold case it will be observed from the excerpt from the
opinion therein reproduced hereinabove the court says:
"And if the amount of the verdict is large as compared to
the nature of the injuries sustained, or the defendant's lia-
bility is a close question, such misconduct is prejudicial and
ground for a reversal." In the instant case, we do not
find, nor can it reasonably be said, that the amount of dam-
ages assessed is out of proportion to the nature and effect
of the injuries sustained or that the defendant's liability is
under the evidence a close question. The testimony of the
doctor who treated plaintiff's injuries clearly shows that
they were serious, in that, as in effect, he declared, her
wrist, perhaps due in a measure to her advanced years,
would never regain its normal strength. Thus, since she
was required to perform manual labor to support herself,
her earning power was to some extent permanently dimin-
ished and her opportunity for securing such employment
as she was able to engage in was, naturally, correspondingly
lessened. Other considerations were that she was not able
by reason of her injuries to work at all for several weeks
after she was hurt, a positive loss to one who is required
to labor for others to earn a livelihood, and the pain and
suffering she was required to endure because of her inju-
ries, in a more or less degree, according to her uncontra-
dicted testimony, continuously to the date of the trial,
which was six months from the time she was injured. As
to the question of the defendant's responsibility for the in-
juries, the testimony of plaintiff and her witness, Hall, as

seen, is to the effect that there was no light at the point where she met with the accident at the time that it occurred, that there was no barrier against or about the excavation into which she fell, and that it was very dark at that place at the time, there being no moon that night or at that particular time. That testimony was not contradicted, except in so far as it might be regarded as having been disputed by the testimony of defendant's night watchman that he placed a lighted lantern at the point of the excavation prior to sunset on the day of the accident, but such "contradictory" evidence is of little apparent force, and, according to the jury's estimate of that fact, as exposed by their verdict, they regarded it as of no force at all, when compared to the accepted positive testimony of witnesses that, at the time of the accident, there was no light of any kind at said place. All the foregoing matters are here considered, not that this court can weigh the testimony or has the right to attempt to do so, since that is the function of the jury, but merely for the purpose of showing that, upon the face of the record, the amount assessed by the jury as damages is not disproportionate to the damage done and that there can be no question under the evidence of the defendant's liability for the injuries sustained by plaintiff, and that from all these well-established facts it is clear that the error in allowing the plaintiff to ask the jurors on their *voir dire* a question to some extent implying that defendant, at the time of the accident, was indemnified against the payment of any damages which might be assessed against it for injuries to others directly occasioned by its negligence was not productive of a miscarriage of justice.

[6] The same question as the one above considered is in a different aspect also presented. It arose from the following cross-examination of one of the physicians who testified for the defendant as an expert as to the nature, extent, and the general effect of the injuries received by plaintiff: "Q. In the examination of this plaintiff, were you employed by the Georgia Casualty Company? The Witness: I was employed by Mr. Gibson. Mr. Welsh: You sent a report, did you not, to the Georgia Casualty Company? Mr. Welsh: You have a copy of the report in your files. The Witness: The Georgia Casualty Company, 41 Montgomery Street,

San Francisco. Q. You sent the original of that to the company—a report of your examination, doctor? A. Yes, sir.''

The cases are not uniform upon the question whether under any circumstances such a line of inquiry in the examination of witnesses in personal injury cases is permissible. There are many cases in which the question is considered, but we will not review them herein. It is, though, quite obvious that it would be highly improper to allow the plaintiff in a personal injury case to show, as an independent fact, having no relation to the other proved facts, that the defendant is protected by indemnity insurance against the payment of any damages which may be awarded against him for injuries directly caused by his negligence. If it is at all competent or legally proper to show the fact, it, perhaps, would have to be done through cross-examination of some witness as in impeachment of his testimony or by way of the impeachment of some special defense. It has been held to be proper to go into the question for the purpose of rebutting the claim of defendant that employees of a certain department of the business conducted by defendant were under the sole control of another party as an independent contractor with defendant. (*Barg* v. *Bousfield,* 65 Minn. 355 [68 N. W. 45].) As going to the question of the credibility or the weight of his testimony, it would seem that it ought to be proper for plaintiff to show by cross-examination of a physician called by defendant to testify and who does testify that he had examined plaintiff's injuries and found that they were less serious in nature and effect than as claimed by plaintiff, that such physician had been specially employed by a surety company by which defendant was indemnified against the payment of any damages awarded against him to make such examination and state the result thereof to the jury. (See sec. 1868, Code Civ. Proc.) Such, however, is not the rule in this state, so our decisions seem to hold. (*McPhee* v. *Lavin,* 183 Cal. 264, 269 [191 Pac. 23]; *Roche* v. *Llewellyn,* 140 Cal. 563 [74 Pac. 147].) But we do not think that the case should be reversed because of the error involved in allowing the physician thus to be questioned by the plaintiff. This conclusion is founded on the reasons above given for holding that the act of the trial court in allowing the examination of the

tentative jurors along the same line could not be held to be of so serious a character as to call for a reversal. In other words, considering the entire record—the nature of the injuries sustained by plaintiff and the effect thereof upon her, the pain and suffering she endured because of those injuries, the ample evidence that defendant's negligence was the cause of her injuries, and the reasonableness, when compared with all the foregoing facts, of the amount of damages awarded her—it cannot justly be declared that the error involved in the ruling permitting such examination has resulted in a miscarriage of justice. (Const., art. VI, sec. 4½.) The answers by the doctor to the questions asked by plaintiff added nothing to what was plainly to be implied from the questions on the same line likewise asked of the jurors on their *voir dire.*

[7] The next and last point urged by defendant is that the amount of damages awarded plaintiff is excessive. This point has practically been answered above in the discussion of the contentions that error was committed in permitting plaintiff to ask the tentative jurors called to the jury-box the question as to defendant's indemnity insurance and the cross-examination of one of the physicians testifying for defendant along the same line. It may be added, however, that, in view of the ordinance of the city of Sacramento expressly superimposing upon defendant the duty of maintaining lights at all dangerous points on the street or sidewalk, it was negligence *per se* for it to have failed in the performance of that duty. But, regardless of that consideration, if the testimony of plaintiff and her witness, Hall, is true (and we must, in view of the verdict, so accept it, since it is not inherently improbable) the defendant, in failing to maintain a light and proper safeguards about the excavation as a protection to those attempting to use the sidewalk at that point was guilty of gross negligence. We are firmly of the conviction that, under all the circumstances of the case, it would be an unjust invasion of the province of the jury for this court to declare the verdict excessive.

[8] Of course, it is to be conceded that the matter of assessing damages in a personal injury case is generally attended with more or less difficulty. The element of pain and suffering, which is proper to be taken into account with other elements in determining in such cases what

would be a just admeasurement of compensatory relief, affords no definite or certain criterion by which the amount to be assigned to that item may be ascertained, and the same is often true, in a less degree perhaps, of other elements of the several which it is comptent to consider in making the general award. Hence, in the last analysis, in the general run of cases, the determination by the jury of the amount which will fairly compensate for the loss sustained by reason of the defendant's tortious breach of a duty which he owes to others must be accepted as an honest, fair, intelligent, and just adjustment of the matter. The rule which thus we attempt to state has, perhaps, never been more succinctly, clearly, and forcefully expounded than in Graham & Waterman on New Trials, page 451 (an old publication, perhaps not now extant), as follows:

"It is clear that the reason for holding the parties so tenaciously to the damages found by the jury in personal torts is, that in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury, governed by a sense of justice. It is, indeed, one of the principal causes in which the trial by jury has originated. From the prolific fountain of litigation numerous cases must daily spring up, calling for adjudication for alleged injuries, accompanied with acts and circumstances affording no definite standard by which these alleged wrongs can be measured, and which, from the necessity of the case, must be judged of and appreciated by the view that may be taken of them by impartial men. To the jury, therefore, as a favorite and almost sacred tribunal, is committed by unanimous consent the exclusive task of examining those facts and circumstances, and valuing the injury and awarding compensation in the shape of damages. The law that confers on them this power and exacts of them the performance of the solemn trust, favors the presumption that they are actuated by pure motives. It therefore makes every allowance for different dispositions, capacities, views and even frailties in the examination of heterogeneous matters of fact where no criterion can be supplied; and it is not until the result of the deliberations of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice and passion that courts have found them-

selves compelled to interpose." (See, also, *Bonneau* v. *North Shore R. R. Co.*, 152 Cal. 406 [125 Am. St. Rep. 68, 93 Pac. 106] ; *Lee* v. *Southern Pac. R. R. Co.*, 101 Cal. 118 [35 Pac. 572] ; *Wilson* v. *Fitch,* 41 Cal 368; *Wheaton* v. *North Beach & M. R. Co.*, 36 Cal. 590; *Aldrich* v. *Palmer,* 24 Cal. 513; *Scally* v. *W. T. Garratt & Co,* 11 Cal. App. 138 [104 Pac. 325].)

We think it would work an injustice to do otherwise than to sanction and support the result arrived at below, and, therefore, the judgment is affirmed.

Plummer, J., and Finch, P. J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on January 9, 1926, and a petition by appellant to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 8, 1926.