[Civ. No. 2870. Third Appellate District.—March 14, 1925.]

**J. H. McCONNELL, Appellant, v. MARY H. QUINN, Respondent.**

[1] Negligence—Personal Injuries—Action for Damages—Burden of Proof—Evidence—Verdict—Appeal.—In an action for damages for personal injuries suffered by plaintiff as the result of a collision between a horse-drawn vehicle being driven by plaintiff and an automobile operated by defendant, it is incumbent on plaintiff to prove that the collision and its consequences to plaintiff were caused by the negligence of defendant and that, by reason of

such negligence, plaintiff suffered some injury or damage which was directly caused by such negligence; and it is for the jury to determine whether plaintiff has established those facts by sufficient evidence, and the conclusion of the jury upon the facts is binding upon the appellate court unless the testimony is of such a character as to compel the conclusion that, as a matter of law, it affords no support to the verdict.

[2] Id.—NATURE AND EXTENT OF DAMAGE SUFFERED—EVIDENCE—VERDICT. — In such action, conceding that the evidence shows as a matter of law that defendant was guilty of negligence and that such negligence constituted the direct cause of the injuries inflicted upon plaintiff and his wagon, a verdict in favor of defendant may stand where the evidence as to the nature and extent of the damage suffered by plaintiff as the result of the collision is in conflict and the jury is entitled to draw the conclusion therefrom that the damage suffered was only nominal and not in excess of the amount paid by defendant for medical treatment administered to plaintiff.

[3] Id.—PASSING VEHICLE ON HIGHWAY — FAILURE TO TAKE PRECAUTION—PUNITIVE DAMAGES.—In such action, where it is clear that, if defendant was guilty of culpable negligence, it was because she failed, before attempting to pass plaintiff's wagon, to take the precaution to ascertain whether the highway before her was clear of vehicles approaching from the opposite direction and so near the wagon as to make it perilous to attempt to pass around it, and the jury could have found, and the implication from their verdict is that they did find, that the act of defendant in turning suddenly to the right as she started to pass the wagon was, according to her best judgment formed under the circumstances, necessary to protect herself against serious injury, and that it was, therefore, not wanton or the result of such recklessness as evinces malice or a conscious disregard of the rights of others, the imposition of exemplary or punitive in addition to compensatory damages is not justified.  ·

(1) 4 C. J., p. 843, n. 65, p. 845, n. 76; 28 Cyc., p. 47, n. 11 New, p. 49, n. 46.   (2) 4 C. J., p. 782, n. 33  New; 17 C. J., p. 1042, n. 28. (3) 17 C. J., p. 987, n. 11, p. 1042, n. 32; 28 Cyc., p. 48, n. 27.

APPEAL from a judgment of the Superior Court of Tulare County.  W. B. Wallace, Judge.  Affirmed.

The facts are stated in the opinion of the court.

J. A. Chase for Appellant.

D. E. Perkins and Power & McFadzean for Respondent.

HART, J.—This action is for damages for personal injuries. The case was tried before a jury, who found for the defendant, and judgment was entered in accord therewith. A motion for a new trial by the plaintiff was denied and he appeals from the judgment and said order.

In the forenoon of the twenty-sixth day of April, 1921, the plaintiff, driving a team of horses hitched to a four-wheel delivery wagon, was traveling in a northerly direction upon a paved highway, in Tulare County and when near Traver, a railroad station in said county, the defendant, driving an automobile in the same direction upon the same highway and rearward of plaintiff, ran his car into and so collided with the rear of plaintiff's wagon. The impact caused the horses attached to the plaintiff's wagon to jump, with the result that the plaintiff fell from the seat of the wagon to the pavement and received certain injuries.

The second amended complaint describes the injuries suffered by plaintiff by reason of the collision and alleges that they were directly or proximately caused by the negligence of the defendant.

The answer consists entirely of specific denials of the material allegations of the complaint.

The contention of the plaintiff is that the evidence, as a matter of law, shows that the defendant was guilty of negligence which proximately caused the injuries he received as a result of the collision, and that, therefore, the court erred in refusing the request of plaintiff for a directed verdict in his favor, that the verdict is not supported by the evidence and is against law. On the other hand, the defendant contends that the question of negligence was for the jury, but that, even if it be assumed that the evidence upon its face shows that she was guilty of negligence which was the proximate cause of the injury, the verdict and judgment are supported by evidence that plaintiff suffered no damage other than that for which he was compensated by the defendant.

The defendant's story of how the collision occurred is, in substance, as follows: That she was driving at a rate of speed

of between twenty-five and thirty miles an hour in a northerly direction over the paved highway mentioned above; that, immediately in front of her, at a distance of about the width of an ordinary street, another party was driving a Dodge roadster at approximately the same rate of speed at which she was traveling; that at or near a curve in the highway, near Traver station, the driver of the Dodge roadster swerved to the left and passed the wagon of the plaintiff; that she started to follow the Dodge car, was in the act of driving to the left of the plaintiff's wagon and had proceeded but a few feet when she observed a large truck in the highway traveling toward her, going in a southerly direction, and at the same instant of time she saw another car turn from the rear and to the left of the truck and into the center of the highway, traveling in a southerly direction or toward· her, at a rapid rate of speed. At once realizing that she could not pass the plaintiff's wagon before either said other car or the truck reached the point where the wagon then was, she suddenly turned her car to the right and, in doing so, struck the rear end of plaintiff's wagon. The defendant testified that the force of the impact by reason of the collision was hardly noticed by her, and in this she was corroborated by a young lady riding with her and occupying the front seat of the car at the time the collision happened. The bumper on her automobile was slightly bent and the front wheels thereof thrown out of alignment as a result of the collision. The noise of the impact seemed to have frightened the horses and this made them lurch forward, causing the plaintiff to be thrown from the wagon to the ground as above stated. The horses started to run, and did run, for a short distance, when, in making a sudden turn, they in some manner became detached from the wagon and ran some distance, when they were stopped by the driver of the truck referred to who "tied them" to a fence. The wagon and the harness were damaged to some extent.

The defendant, immediately following the collision, alighted from her car and started to the spot where the plaintiff had fallen. Before she reached that spot the witness Rice, the driver of the Dodge roadster, had stopped and turned and driven back to where the plaintiff was lying on the pavement and assisted him to his feet. Blood was

flowing from a wound on his head. Rice stated that at first plaintiff appeared to be somewhat dazed, but within a few minutes seemed to recover himself and insisted on getting his wagon and team and proceeding on. He was, however, urged by those present, including the defendant, to go to a doctor and receive treatment. As to this matter and what followed the visit to the doctor, the defendant testified:

"He had this cut on his head which was bleeding, and I felt that it ought to be cleansed, so I said to him, 'I would like to take you to a doctor and have that cleansed.' He said he had never been in a doctor's office before and he was not hurt much and he did not wish to go. But in spite of his protesting, I insisted that he go. I took him in my car and took him to Dr. Gillespie at Kingsburg. Dr. Gillespie dressed his wound on his head, this cut, and just felt of the head in—just felt of him in a general way. I remember a scratch on his elbow. I do not remember that he said a word about his neck or his hip or anything else when we were in Dr. Gillespie's office And after that was done we took him on to Fresno which was his destination. ' We piled all of his things into our machine and took him on to Fresno, because he said that was where he was going and where he wanted to go. We took him to his home in Fresno. Q. When you were talking to him there before you put him in your car did he complain anything about suffering from pain? A. No, he said he was not hurt very much. He said his harness and wagon were all right, he could drive the team. Q. And after you got him in the car, between that time and the time you got to Dr. Gillespie's office, did he complain of any pain? A. No, not a word. Q. After Dr. Gillespie had dressed his wound and you started with him to Fresno, did he complain of anything? A. I do not remember that he said a word about any pain. I do not remember that our conversation was about that. We talked and visited, just as friendly as any person ever visited. I never dreamed of his suing me. Q. When did you next see him? A. I did not see him again until—it was some time before Christmas of that same year. Q. Where did you see him then? A. He came to my house to see me. Q. Did you have any conversation with him at that time? A. Yes, sir. Q. Do you remember the substance of it? A. Yes, I think I do. He

came to see me, see what I was going to do about that accident, and I told him I was not going to do anything, that I did not feel that I owed him anything, and we talked about it. And I said that 'I took you to the doctor in Kingsburg to have that cut in your head dressed because I thought it was a kind thing to do; and you did not want to go to the doctor.' And I said, 'Wouldn't you have done that for me, if I had been the injured one?' He said, 'Yes, I would.' Then I said that day he had every appearance of being a very poor man and the damage to his wagon and harness seemed to mean a great deal to him, and I told him that I would fix up the wagon and harness for him.''

A. W. Quinn, husband of defendant, testified that, some time after the date the accident happened, the plaintiff called on him at the bank with which he (Quinn) was connected at Exeter, Tulare County, and ''stated he had a bill against me for some damages that was done by this accident out north of Traver. And I asked him what they were and he said—I can't remember the exact amount, but it was a dollar or two for his repairing his wagon, it seems to me, and a doctor bill of $3 or $4, something like that. I don't remember the exact amount.'' The witness gave plaintiff a check for the amount. The check was produced, was identified by the witness as the one he gave to plaintiff and was introduced in evidence. It called for the total sum of $19.75, payable to plaintiff. On the back of the check, in the handwriting of the witness, was this indorsement: ''Wagon repair, $15.00; doctor bill, $4.75.'' The witness stated that that indorsement was written on the back of the check before he delivered the check to plaintiff. The witness stated that, before delivering the check to plaintiff, the latter made no complaint of having suffered any personal injuries other than those already spoken of, and made no claim to damages other than those for the injury to his wagon and the bill of the doctor for medical treatment. After receiving the check, though, the plaintiff, so the witness testified, said that ''he would want something for personal injury. I do not know whether he used 'personal injury' or not, but that was the sum and substance of it. I asked him in what way he was damaged. Well, he said he did not know but since the injury he had not been able to do much of anything, he felt

he was injured and that·he would want something for it.  I asked him what he thought he was damaged, and he said he did not know and that was about all of the conversation we had.  Q. Did you decline to pay him anything?  A. He did not state what he wanted.  I told him I did not know anything about it, that I was not there, and if he felt he was injured in any way to go and see my wife.  And later he did call upon my wife.  In substance that is about all I can remember of the incident at that time."

Dr. J. A. Gillespie, to whom the defendant took the plaintiff for treatment immediately after the accident, testifying for the plaintiff, stated that, because the plaintiff at the time he treated him immediately following the accident, "did not seem to be very badly hurt," he took and preserved no notes of the nature of the injuries.  He stated that at that time he found on the top of plaintiff's head "a little injury, not much," and also "a few scratches upon his body. . . . The only injury I treated was on the top of his head at that time."  Subsequently plaintiff called at the doctor's office two or three times, and "if I remember correctly, he complained of his back or neck or something.  It has slipped my memory, because it has been so long ago.  Q. Did you render any treatment to any other portions of his body?  A. I do not know whether I gave him something to—or strapped it, or what I did.  I have forgotten what I did do—not much.  Q. You do not recollect of putting a plaster on his body any place?  A. Well, I may have strapped it, that is, put some adhesive on it, like I often do in cases. . . . Q. You do not recollect how many times Mr. McConnell came to your office?  A. Oh, he was backwards and forwards between Fresno and Goshen Junction two or three times.  Q. And he came to your office that many times, you recollect?  A. He would stop, yes."

The plaintiff, after telling what he remembered as to the manner in which the collision was brought about, which varied little, if any, from the defendant's description of the way that it occurred, testified that he was stunned and for an instant of time dazed as a result of his fall to the pavement.  He said that the defendant insisted on taking him to a doctor, and recalled saying to her and others present that he "did not think he was hurt bad," but that he got

in defendant's car and was by her driven to Kingsburg and to Dr. Gillespie's office; that the doctor dressed a wound on the top of his head; that no stitches were taken in the wound, but that the doctor cleansed the wound with some medicinal preparation and then covered it with cotton over and upon which he put an adhesive plaster. Plaintiff was not certain whether the doctor examined his neck, back and hip at that time, but that subsequently he did; that he had no recollection of what the doctor said at any time as to the condition of his back, neck, and hip; that he was then "suffering pretty badly with my neck," but "not so much with my hip"; that he could not say whether on that occasion he told Dr. Gillespie that his hip "was bothering him." Plaintiff then told of having been taken to his home in Fresno by the defendant; that he was not certain that he and defendant talked about or discussed his injuries while they were on their way from Kingsburg to Fresno, or whether he stated to her "how he felt." Plaintiff called on Dr. Gillespie, so he testified, on the twenty-eighth day of April, 1921, two days after the accident. At that time, he said, the doctor put a plaster on his hip; that that was the first time that the doctor had so treated his hip; that the plaster remained on his hip until the 25th of May, 1921, when he, assisted by members of his family, removed it. In the meantime, he said, he consulted and was given treatment by a Dr. Edwards, a chiropractic, at Fresno, and later, he further said, he was treated by a Dr. Gass, an osteopath, residing at Visalia. A few days prior to the beginning of the trial, a Dr. Morehouse, an osteopathic physician at Visalia, examined the hip, back, and neck of plaintiff. (Neither Dr. Edwards nor Dr. Gass was called as a witness. Dr. Morehouse testified for the plaintiff.) The plaintiff, continuing, said that, from the time of the accident to the time of the trial, his neck was swollen; that this "swelling would pass off at times, went down." On cross-examination he stated that, when a young man, some forty years prior to the date of the accident, he suffered occasionally from rheumatism in his back and in the regions of his hips, but that it had been years since he had so suffered. He further stated that he had never consulted "any physician or surgeon for the purpose of ascertaining whether the pain he complained of came from any

other cause than this collision that he had at Traver. Further, on cross-examination, he stated that, before the collision involved herein, he had met with "different accidents"; that a horse once "hit me on the wrist. . . . Q. Did that hip that you complain of being in pain now, did it ever receive an injury before—ever fall on it before? A. Well, I might have fell sometimes, probably did." On redirect he stated that he had suffered continuously from pain due to the injuries received by him, "until the present time, unless when I was asleep it might have stopped."

Dr. Morehouse testified that he found, on his examination of plaintiff, "a vertebra loose in his neck." This defect, the doctor said, was not a dislocation; that it was produced by some cause external to the body. He could not say when the wound or injury was produced. The doctor also found, so he said, that there was a disorder in the region of the hip. The latter condition, he explained, could have been produced by different causes. "Riding in a car will do it," he said, "simply riding in an automobile will do it, or a blow applied there will do it. Sometimes it follows an infection of the teeth or tonsils." He stated that this condition may last for a long period of time, unless it is corrected; that he had known it to last "four or five or six years." Such a condition, he stated, was a source of pain, constant in most cases, to the patient. He said that he did not examine the teeth and tonsils of plaintiff. As to the swelling in or about the neck, the doctor stated that it "was caused by a lesion occurring by a trauma" (external violence of some sort). There are "so many conditions that could cause that, though. I have had cases where persons have been jounced and their head hit against the top of the machine, and that caused it; where a person has gone over a rough bump." He stated that a large proportion of the people that he has treated are afflicted with the same ailment in the neck.

Members of the family of plaintiff testified that the latter's physical condition had been bad continuously from the time that the collision occurred down to the date of the trial. Some of them stated that the wound on his head consisted of a gash over four inches long; that he had suffered great pain in the region of his hip and back almost incessantly.

Dr. A. W. Preston, a practicing physician and surgeon at Visalia, was called in rebuttal by the defendant as a medical expert. He testified that he listened to and heard the plaintiff describe the examination to which he had been subjected by the chiropractic above named, as follows: "That he (the chiropractic) felt over my neck and felt a place he said was out of place and he tried to put them back in place." The witness said that a condition so described and the pain attending it would mean a dislocation of a vertebra, and would be very serious, that such a dislocation "would be attended by serious disarrangements of other bodily functions." In order to determine, said Dr. Preston, "the cause of such pain, it would be necessary to make a complete physical examination of all the functional organs—the kidneys, the heart, blood pressure, the reflexes of the nervous system." He expressed the opinion, from the description of the hurt in or about the neck, that the pain which the plaintiff said he had suffered in that region of his body was not the result of the dislocation of a vertebra or any other kind of dislocation. As to the alleged injury in the region of the hip, the doctor said that, ordinarily, a bruise of such a description, or swelling of the parts produced from such a bruise or injury as the plaintiff stated he had suffered and as the latter described it, would heal "in a few weeks—perhaps from three to six weeks. . . . No ordinary injury would cause any swelling that would last from" the month of April, 1921, down to the date of the trial. On cross-examination Dr. Preston declared that it would not be possible for "the man to have a cracked vertebra and still continue about his business and not know it was cracked for some time." To clarify the opinion previously given by him relative to the condition of a person injured as the plaintiff said he had been by falling from the wagon, Dr. Preston explained, on cross-examination: "My supposition and proposition is this: That if Mr. McConnell received an injury to his back or hip two and a half years ago and still has a swelling in the region of that injury in his side, hip or back, that it is still present, that his injury at the time must have been very severe and that the man would have been in a very critical condition during the two and a half years," and that "he would be in that same critical condition at the present time."

The above statement embraces an accurate as well as a comprehensive conspectus of the important testimony presented by both sides.

[1] Obviously, as in all personal injury cases, it was incumbent on the plaintiff to prove these two general propositions of fact, to wit: 1. That the collision and its consequences to plaintiff were caused by the negligence of the defendant; 2. That, by reason of such negligence, the plaintiff was damnified—that is; that he suffered some injury or damage which was directly caused by such negligence. And it was for the jury to determine whether the plaintiff established those propositions by sufficient evidence. It is also true and, indeed, so much a commonplace as a legal proposition in this state as to render its statement superfluous, that the conclusion of the jury upon the facts is binding upon a court of appeal unless the testimony is of such a character as to compel the conclusion that, as a matter of law, it affords no support to the verdict. [2] As seen, the plaintiff contends that the defendant's own testimony, which, as to the circumstances under which the collision was caused is not contradicted but supported, upon its face, or, as a matter of law, shows that she was guilty of negligence in running her car into the wagon of the plaintiff, and that such negligence constituted the direct cause of the injuries inflicted upon him and his wagon. The defendant, while resisting that position, insists that, conceding it to be sound, the verdict must, nevertheless, still be permitted to remain undisturbed for the reason that it is sufficiently supported by the testimony bearing upon the question of the nature and extent of the damage suffered by the plaintiff as the result of the collision. To this proposition the plaintiff has offered no reply, and we think none can successfully be interposed. It must be said that the evidence as to the nature and the extent of the damage suffered by the plaintiff is in conflict, and it may, therefore, be granted that had the verdict been for the plaintiff, the conclusion of the jury that the plaintiff had received physical injuries of a more serious character than Dr. Gillespie's testimony indicates that they were, might stand immune from disturbance by this court; but the testimony of that doctor, corroborated by the testimony of the defendant and the expert testimony of Dr. Preston, and,

indeed, in a noticeable degree by the testimony of the plaintiff himself, sufficiently supports the implied finding of the jury that the physical injuries inflicted upon the latter were of a minor and temporary character and in no way or to any appreciable extent interrupted or interfered with the performance by him of his usual or ordinary duties. If it be said that, conceding the negligence of the defendant, the plaintiff was entitled to recover *some* damage, even though the injuries were slight and their effect not permanent, the reply would be that we must presume that the jury regarded the amount of the damages to which he might be entitled would be nominal only—indeed, not in excess of the amount which the defendant paid for the medical treatment administered to plaintiff by Dr. Gillespie.

[3] It is not claimed, nor does the evidence appear to justify such a claim, that the plaintiff was entitled to recover anything more or further than compensatory damages, for defendant testified that, seeing the Dodge roadster which was a short distance ahead of her turn to the left and pass the wagon, she assumed that she could safely do likewise and so attempted to follow the roadster around the wagon; that, on making the turn, she discovered that a large truck and an automobile were approaching and so near where the wagon was that it appeared to her that there would be great danger of a collision between her car and either the approaching automobile or the truck and she thereupon suddenly swerved to the right and struck the rear of plaintiff's wagon. Thus it is clear that, if the defendant was guilty of culpable negligence, it was because she failed, before attempting to pass the wagon, to take the precaution to ascertain whether the highway before her was clear of vehicles approaching from the opposite direction and so near the wagon as to make it perilous to attempt to pass around it. So it is manifest that the jury could have found, and the implication from the verdict is that they did find, that the act of defendant in turning suddenly to the right as she started to pass the wagon was, according to her best judgment, formed under the circumstances as indicated, necessary to protect herself against serious injury, and that it was, therefore, not wanton or the result of "such recklessness as evinces malice or a conscious disregard of the rights of others" (*Lyles* v.

*Perrin,* 119 Cal. 264 [51 Pac. 332], and this must be shown in an action for personal injuries to justify the imposition of exemplary or punitive in addition to any compensatory damages which may be assessed.

The foregoing views and the conclusion necessarily following therefrom make it unnecessary to consider herein whether, as the plaintiff contends, the verdict, in so far as it may concern the question of the defendant's alleged negligence, is contrary to the undisputed evidence and the legitimate inferences to be deduced therefrom.

The judgment and the order are affirmed.

Plummer, J., and Finch, P. J., concurred.