[Civ. No. 22221.   Second Dist., Div. Two.   Oct. 7, 1957.]

ROBERTA MARY SHIELDS, Appellant, v. ROBERT R. WONDRIES et al., Respondents.

Nicholas & Mack, and A. F. Mack, Jr., for Appellant.

Parker, Stanbury, Reese & McGee and White McGee, Jr., for Respondents.

FOX, J.—Plaintiff appeals from a judgment denying her any relief for injury to her property caused by the seepage of water from defendants' land.

The properties here involved are adjacent residence lots in the hilly portion of the Flintridge area of Los Angeles County. Plaintiff's lot is east of defendants' which is on higher ground. Both lots front on Hampstead Road, which bounds the properties on the north. Beresford Way borders on defendants' lot on the west. Hampstead Road intersects Beresford Way at the northwest corner of defendants' property. In the other direction, Hampstead road intersects Chevy Chase Drive, which forms the eastern boundary of plaintiff's property. Hampstead Road slopes generally to the east.

Plaintiff acquired her property in 1944. At the time of the purchase it was improved, *inter alia,* with flagged terraces and a masonry wall adjacent to the property line separating her property from that of defendants. Soon thereafter plaintiff built a guest house which has been occupied by her since its completion as a residence. When plaintiff purchased her property the lot now owned by defendants was unimproved with any buildings.

In 1949 defendants purchased their property. Soon thereafter they made certain improvements thereon, including a residence, swimming pool, bath house, blacktop paving and additions to the private sewage system[1] then on the property. These additions included a septic tank and a pumping pit. Soil was brought in to make fills and for gardening. Approximately 35 per cent of the surface of defendants' property was covered by a hard surface.

---

[1] There was no public sewage system in this locality.

For the purpose of showing the physical relationship and condition of the properties, we quote the following from the findings of the trial court: "That prior to 1944, a cobblestone flume was built on the easterly edge of the property now owned by the defendants, which flume was parallel to and at the very edge of the westerly boundary of plaintiff's property and the said masonry wall. That when the said property of the defendants and the said property of the plaintiff were in an unimproved condition, there existed and had existed for many years a natural water course extending in a general easterly, or northeasterly, direction through the said property of the defendants and continuing into and upon the said property of the plaintiff. That the downward gradient of the said natural water course was generally from the west to east or from the southwest to northeast. That except for the said cobblestone flume, surface waters flowing on the defendants' property would have been dammed by the wall either southerly or northerly along the wall, except to the extent that such surface waters might have seeped into the ground. That with the flume in place said surface waters flowed and continued to flow across the property of the defendants onto Hampstead Road, a highway that runs along the northerly side of the properties of the plaintiff and defendants . . ."

At the time defendants purchased their property two drainage pipes had been laid by the county under a culvert across Beresford Way. These pipes extended onto the west side of defendants' property. They collected surface water west of Beresford Way and discharged it over the westerly portion of defendants' property and in the direction of plaintiff's property, where, however, the flow was interrupted by the cobblestone flume and plaintiff's wall. In order to handle this drainage problem defendants consulted E. E. Mitchell, a civil engineer and drainage expert. As a result, a catch basin was built on defendants' property to take the flow from the southerly pipe. Some time later the county sealed off this conduit, diverting its flow from defendants' property and into Hampstead Road. The northerly conduit was extended by means of an 18 inch pipe that terminated in a concrete retaining wall immediately north of the bathhouse at a point where the blacktop joins a retaining wall. Discharge from this 18 inch pipe flows over the blacktopping to the flume and is carried by the flume to Hampstead Road. Another pipe was installed from the catch basin to the northerly pipe so

that the water received by the catch basin flowed into it and was carried off by the flume after being discharged on the blacktop.

It was in the summer of 1951 that defendants began the development of their property. In the following December plaintiff observed seepage in the area of her property immediately east of her westerly line. During January 1952, heavy rains caused the area behind plaintiff's house to be inundated, the water to seep up through the floor and damage her furnishings. This was, however, an unusually heavy rainfall. Following this incident a written protest was made to defendants regarding the damage assertedly caused to plaintiff's property by defendants' installations.

On several occasions after the addition to defendants' sewerage system the pumping pit failed to function properly and "on such occasions" the court found, "the defendants negligently permitted sewage effluent to flow into said cobblestone flume" and caused offensive stench. For this damage plaintiff was awarded $1,000. Also, defendants were enjoined from permitting the discharge of any sewage effluent upon or near said flume. The judgment required the defendants to pave the flume in such a manner as to render it reasonably impervious to surface water and other surface effluents. This portion of the judgment is not under attack by any of the parties.

Plaintiff's Exhibit 49 shows the amount of water defendants purchased per month from the Valley Water Company for use on their property from the beginning of 1952 to May, 1955. It varies from a low of 1,000 cubic feet (approximately 7,500 gallons) for December, 1952, to a high of 15,200 cubic feet (approximately 114,000 gallons) in July, 1954, and shows a monthly average of 5,400 cubic feet (40,500 gallons). For the summer months (June, July, August and September) the average monthly use was 9,100 cubic feet (approximately 68,300 gallons). Equating Exhibit 49 in terms of the daily average in gallons of water consumed on defendants' premises for the three year period 1952 to 1954, inclusive, we get the following approximate results: 1,260 gallons per day in 1952; 1,390 in 1953, and 1,500 in 1954. For the six months' period from May to October, 1954, defendants used an average of 2,154 gallons per day; in July of that period they averaged 3,700 gallons per day.

There was testimony on behalf of plaintiff that seepage of water onto her property from defendants' land had created

substantial damage, viz., separation and displacement cracks had appeared in plaintiff's masonry wall, which was adjacent to the western property line, running parallel to the cobblestone drain; her flagstone terrace suffered disintegration with settlement of steps or cement treads; and cracks occurred in the sides and in the foundation of the lily pond with disintegration also occurring in the adjacent planters.

The trial court found: "That except as otherwise found in paragraph VI [relating to the discharge of sewage effluent] of the Findings, it is not true that the defendants, or either of them, were negligent or careless with respect to the construction, placing, maintenance or use of any of the improvements, installations or structures on their said property; but it is true, except as otherwise found in paragraph VI of the Findings, that the defendants, and each of them, at all times have used ordinary care in the use of their said property, and that the improvements, structures and installations thereon had constituted and do constitute a reasonable, beneficial use of their said property." On the basis of this finding the court refused to grant plaintiff any relief except for the discharge of the sewage effluent.

During the trial considerable testimony was offered by expert witnesses, both pro and con, on the question of whether the several installations on defendants' property had formed underground dams which constricted the natural flow of the underground water, thus raising the natural underground water level on plaintiff's property and causing damage through seepage. During the course of the trial test borings were made on plaintiff's property to establish the exact water level. The court, however, refused to make any finding on "whether the underground water level was or was not raised by the acts of the defendant [sic]," on the ground that such a finding was immaterial.

Plaintiff bases her argument for a reversal primarily on the doctrine of *Fletcher* v. *Rylands*, L. R. 1 Exch. 265. Hence she argues that defendants are absolutely liable for any injury to her property caused by water escaping from their land. The doctrine of *Fletcher* v. *Rylands* is not here controlling because plaintiff's claim for relief is founded not only upon the theory that large amounts of water have been brought onto defendants' land and have been permitted to escape through seepage and percolation but also upon the theory that the improvements made by defendants interfered with the natural flow of the underground waters, thus raising

the water level on plaintiff's property and thereby injuring it. The water thus interfered with, of course, includes that absorbed from normal rainfall on defendants' land and any additional water that percolates from the higher ground.

The defendants' position is that they are insulated from any liability by the court's finding that they were not guilty of any negligence in the installation of their improvements or in the use of their property. Unfortunately, the issue is not that clear-cut and simple.

■ Freedom from negligence does not under all circumstances protect a landowner from liability for injury to his neighbor's land caused by escaping waters that have been brought onto his property. (*Parker* v. *Larsen,* 86 Cal. 236 [24 P. 989, 21 Am.St.Rep. 30]; *Kall* v. *Carruthers,* 59 Cal. App. 555 [211 P. 43]; *Nola* v. *Orlando,* 119 Cal.App. 518 [6 P.2d 984]; *Stoops* v. *Pistachio,* 70 Cal.App. 772 [234 P. 423].)

In *Parker* v. *Larsen, supra,* defendant permitted the water in a ditch which he had constructed on his land to percolate through the ground from the ditch onto his neighbor's land, saturating and injuring it. Although no negligence was found, the defendant was held liable for the damage thus caused. This case is referred to in *Sutliff* v. *Sweetwater Co.,* 182 Cal. 34 [186 P. 766]. At page 37, the court places the rationale of that decision on the ground of a nuisance, that is, that the acts of the defendant created a private nuisance as to the plaintiff.

In *Kall* v. *Carruthers, supra,* the court held that a property owner who by artificial means brought water onto his land for irrigation and allowed it to escape by percolation so as to injure the land of the adjoining owner was liable to the latter in damages for the injury thus caused. In arriving at this decision the court relied on the theory of nuisance, citing section 3479, Civil Code, which declares, among other things, that ''an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property,'' is a nuisance. The court also relied on *Parker* v. *Larsen, supra.*

■ Relying on the Parker, Kall and Stoops cases, *supra,* the court points out in *Nelson* v. *Robinson,* 47 Cal.App.2d 520, 526 [118 P.2d 350], that one who permits water to percolate from his land to the property of his adjoining neighbor may be guilty of creating a nuisance from which the latter is entitled to relief. To the same effect see *Fredericks* v.

*Fredericks*, 108 Cal.App.2d 242, 244 [238 P.2d 643]; *Goodyear Tire & Rubber Co.* v. *Gadsden Sand & Gravel Co.*, 248 Ala. 273 [27 So.2d 578]. ▮ Although frequently negligence and nuisance coexist, a nuisance and liability for injuries occasioned thereby may exist without negligence. (*Curtis* v. *Kastner*, 220 Cal. 185 [30 P.2d 26]; *Snow* v. *Marian Realty Co.*, 212 Cal. 622, 625 [299 P. 720]; *Kafka* v. *Bozio*, 191 Cal. 746, 748 [218 P. 753, 29 A.L.R. 833].) ''A nuisance may not, necessarily, grow out of acts of negligence, but may be the result of skillfully directed efforts—efforts which may be skillfully directed towards accomplishing the desired end, but which may not have due regard for the rights of others.'' (*District of Columbia* v. *Totten*, 5 F.2d 374, 379 [55 App.D.C. 312, 40 A.L.R. 1461].)

▮ From these authorities it is clear that an owner of land may not do even nonnegligent acts on his property with impunity where they create a nuisance as to his neighbor, and that in such circumstances the owner of the neighboring land is entitled to appropriate relief. This proposition is fortified by section 3514, Civil Code, which states: ''One must so use his own rights as not to infringe upon the rights of another.'' The maxim here codified was relied upon in both the Parker and Kall cases, *supra*.

▮ Whether a particular use is a nuisance cannot be determined by any fixed general rule; it depends upon the facts of each particular case, such as nature of the use, the extent and frequency of the injury, the effect upon the enjoyment of health and property, and other similar factors.

▮ A basic principle of the law of private nuisance is that substantial harm is required. (Prosser, Torts 389 (2d ed. 1955); Rest. Torts, § 822.) And the gravity of the harm must be weighed against the utility of the defendant's conduct. (Prosser, op. cit. *supra* at 411; Rest., Torts, §§ 826-831.)

▮ In the case at bar the rise (if any) in the water level on plaintiff's property was one of the factors which should have been considered in determining whether or not a nuisance existed, since that would be one facet of plaintiff's injury and would have a definite bearing on the question of whether or not plaintiff was entitled to any relief. By treating this factor as immaterial and by failing to make a finding thereon, the trial court committed error.

The judgment is reversed with directions to make a finding as to the rise, if any, of the water level on plaintiff's property

and to determine whether a private nuisance existed, and then to enter an appropriate judgment in accordance with such finding and determination.

Moore, P. J., and Ashburn, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied December 4, 1957. Traynor, J., was of the opinion that the petition should be granted.