[Civ. No. 18074. First Dist., Div. Two. Nov. 19, 1958.]

ALBERT B. STURGES et al., Plaintiffs and Respondents, v. CHARLES L. HARNEY, INC. (a Corporation), Appellant; CITY AND COUNTY OF SAN FRANCISCO, Cross-defendant and Respondent.

Keith, Creede & Sedgwick and Scott Conley for Appellant.

Lenz, Jarvis, Miller & Decker, Hugh B. Miller and Charles W. Decker for Plaintiffs and Respondents.

Dion R. Holm, City Attorney, and George E. Baglin, Deputy City Attorney, for Cross-defendant and Respondent.

KAUFMAN, P. J.—Plaintiffs brought this action for damages and for injunctive relief, against Charles L. Harney individually, and Charles L. Harney, Inc., a corporation. The defendant cross-complained against the city and county of San Francisco. The trial court entered an order striking the cross-complaint and entered a judgment of nonsuit as to Charles L. Harney, individually. After a jury trial, the court rendered judgment on the verdict in favor of the plaintiffs, awarding both compensatory and punitive damages. After further proceedings, without a jury, the trial court issued a mandatory injunction, ordering the defendant to take action to abate the nuisance. Defendant appeals, alleging errors as to: (1) the trial court's instructions to the jury; (2) the amount of compensatory damages other than property damages awarded; (3) the propriety of the injunctive relief; (4) the court's action in striking defendant's cross-complaint against the city and county of San Francisco.

The 11 plaintiffs are the owners of adjacent lots of improved land, Numbers 281, 283, 285, 287, 289, and 295 on Juanita Way in San Francisco. All of the plaintiffs, except Mr. and Mrs. Arnold (owners of 287) and Mrs. Kurchinski (owner

of 281), live in their homes on the land in question. The plaintiffs' land is at the northern foot of Mount Davidson. The land of the defendant corporation lies uphill immediately to the south of plaintiffs' properties. Before the defendant began his operations, the area above plaintiffs' was a gently sloping, heavily wooded hill. The water, brought from the upper slopes of Mount Davidson by a natural ravine, spread into a fan shaped sheet flow over the slope. Drainage had been provided since 1932 by a ditch, about 1 foot deep and 3 feet wide, which followed the contour of the land behind plaintiffs' properties. This ditch, which was constructed by the original subdivider, drained into a central catch basin at the rear (south) of plaintiff Sturges' property. From the catch basin a 6-inch terra cotta line ran to the city sewer on Juanita Way. These drainage provisions had been sufficient for the past 25 years.

In the summer of 1955, the defendant began its "cut and fill" operation for the purpose of building a part of the Dalewood subdivision. The defendant cleared and excavated its property, creating a bench in the slope of the mountain, and then constructed an earth fill thereon. The fill was approximately 35 feet high and 460 feet long; its surface comprised 55 acres. The base or "toe" of the fill was located 5 feet south of the rear property line of plaintiffs' properties, and covered the existing drainage ditch. The fill increased the steepness of the slope behind plaintiffs' properties to an almost perpendicular one. The east end of the fill obstructed the natural ravine and concentrated the flow of water into a narrow channel.

Defendant had made his application to do the grading work on April 29, 1955, representing that the maximum depth of the fill would be about 20 feet. The application was approved conditionally upon defendant's compliance with sections 308 and 4112 of the Building Code of the City and County of San Francisco. Under the terms of section 4112 (adopted in March 1954), fills of more than 15 feet are "special grading areas." For these, as a condition of issuance of a permit, the ordinance requires a written report of a civil engineer or soils engineer, substantiating the permanence and safety of the sections and certifying that the proposed grading will have no objectionable effect on the surrounding property, or health and safety. The ordinance further provides:

"Final treatment of surfaces. After the grading operations

are completed and within 30 days thereafter, surface drainage facilities shall be created which will accumulate and channel all rainfall run-off into proper drainage courses. This shall be done in such a manner that erosion and disposition of sediment upon areas, where such will be objectionable, will be kept to the absolute minimum possible. Every effort shall be made to keep sediment from being carried to public streets or sewers.

"Where necessary to prevent erosion, planting will be required, as approved by the superintendent."

"Disposal of surface and subsurface waters. Upon completion, excavations and fills shall in all cases be graded in such manner as to prevent the accumulation of storm waters or natural seepage. All surface or subsurface drainage existing, or developed by or through the grading or excavating shall be controlled by dikes, barriers, or drainage structures to prevent any silt or loose material from filling any existing drainage course or encroaching on any state highway, city street, or public or private property. All provisions to control natural drainage or flood waters shall meet with the approval of the director.

"Disposal of waters shall be made into accepted established water course, or into a public disposal system, and the final sections shall be such that they will not entail future maintenance by the city, except such maintenance as normally required to the public disposal system."

The defendant testified that at the time the fill was constructed, his company was unfamiliar with the above ordinance. The civil engineer employed by the defendant to plan the subdivision, stated that he was never asked to plan drainage facilities, and never submitted the soils report required by the ordinance. The uncontroverted evidence established that defendant had never complied with these requirements. Throughout the trial and in the subsequent equity proceeding, defendant maintained (alternately) that his operation was not a "special grading" area to which the building code applied; that the reports in question did not have to be filed until after the completion of construction, and that the water came, not from his property, but from the city's property on Mount Davidson, and that drainage was the city's responsibility. Defendant's foreman testified that because of the loose material, the slope was steeper than the building code permitted. The defendant's construction superintendent testified that even though the map placed the toe of the fill 5 feet

behind plaintiffs' property line, it was placed 8 feet, thus making the slope even steeper.

On November 16, 1955, Sherman Duckel, the Director of Public Works of the City and County of San Francisco, wrote to the defendant, informed him of the complaints received from the residents of Juanita Way, and specifically called the defendant's attention to section 4112. The letter continued:

"Your soils engineer should furnish the Bureau of Building Inspection with detailed recommendations as to the installation of drainage facilities and embankment protection, which should be installed at once to prevent further erosion."

On November 18, defendant answered as follows:

"We are not entirely familiar with what you have reference to when you state that the erosion of the embankment created by our grading operations has caused complaints, but we would appreciate the opportunity of going to the site with you and being advised just what is wrong with our operations.

"We have been informed by one of the Meyer Brothers, construction firm that built the homes of the property owners, that most of these places had catch basins built in the back yards because of the severe amount of drainage that have always run in there. Our representative advises us that there is far less water in the vicinity of their back yards today than ever before, because water that runs down from the property east of our property, is being carried off through construction operations and down onto Juanita Way."

On December 2, the director of public works again wrote to the defendant, stating that a building inspector should be contacted to meet at the site with the defendant. Defendant answered in part as follows:

"We have discussed this matter with representatives of your building department over the telephone and, unfortunately, we were not able to understand exactly what they had in mind.

"Possibly if it isn't too much trouble, you could have the person who has an objection of some kind in mind submit in a note telling us just what is wrong."

On December 22, the director of public works again wrote to the defendant, stating that additional complaints had been received from the Juanita Way residents. The letter also stated:

"The Bureau of Building Inspection informs me that you have not met the code requirements in that you have not

furnished the information regarding the drainage of this project, nor have you taken proper steps to protect adjoining properties.''

On December 30, the defendant replied that all of his representatives had unanimously concluded that the condition was due to the inadequacy of the catch basin and sewer system, that the water was not coming from his property, and that:

''Unfortunately, we do not know what your Bureau of Building Inspection Department means when they state that we have not met the code requirements, and when they state that we have not furnished information regarding the drainage of this project.''

The director of public works replied on January 18, enclosed an explanation of the building code requirements from the superintendent of the bureau of building inspection, and stated that the catch basin had never been accepted by the city for maintenance, that the sewer to which the catch basin connected had recently been inspected and was in good condition. On June 4, the superintendent of public works again wrote to the defendant about the drainage facilities in the area. On June 30, the defendant answered stating in part:

''Now when you refer to providing proper drainage facilities, I am sure I do not understand what you mean. It appears to us that this property will be in no different position than it was before we started to work at this location, and at that time there was no way to provide drainage facilities other than what exists there now. The rain water and such is going to continue to run down from the city's property, and, of course, a great percentage of it will now run onto our land and in the street area of Dalewood Avenue, but there will always be that certain volume that will not run down Dalewood Avenue but will run down the rear of our property and in the areas down to the blocks to the north. I sincerely hope you are not expecting us to take care of this.

''As far as silt and loose materials are concerned, we don't believe there will be any coming off our property but we do feel there unquestionably will be some that will come from the city park areas. We believe you have a serious problem there, as far as the Park Commission is concerned. They are completely shirking their responsibility and we feel and we think we can prove that they caused all the trouble that already has developed at this location. Most of the water that ran into the area where we were working continued west

and ran down to Lansdale Avenue. The condition of our sewers is absolute proof of that.''

On June 22, the superintendent of public works had informed the defendant that he would not proceed with respect to another house he was moving until the defendant had done the following with respect to the area above the plaintiffs' properties: (1) Removed the railroad ties and constructed a masonry wall; (2) cleaned off the easement and opened or reconstructed drainage; (3) established a proper water course, and (4) repaired the eroded embankment and replanted the slopes. To the date of the trial, defendant had not done any of these things and had abandoned the construction project in question.

As soon as defendant's activities started in the summer of 1955, rocks and boulders (some as large as 2 inches in diameter) rolled into the back yards of some of the plaintiffs, one house was hit by a rock. The plaintiffs were continually removing rocks and loose material from their back yards. One of the plaintiffs testified that she was afraid to let her children play in the back yard because of the danger of falling rocks. On occasion, the defendant's laborers removed rocks from the yards. When one of the plaintiffs talked to defendant's foreman, she was told they could do nothing about the falling rocks. The Sturges' had mud on their property and water in the basement in October. When Mrs. Sturges phoned John Harney he was quite short with her and hung up.

In November and December of 1955, after the rains started, large quantities of mud and water inundated the rear portions of plaintiffs' properties. The plaintiff Sturges noted ''a regular waterfall'' down the fill slope toward his home; this waterfall dug an 18-inch gully and broke a temporary shoulder on the road above. Sometime in December the catch basin was obliterated by the fill. On December 21, a slide crashed through the fence of the plaintiff Peterson, bringing mud and debris within 12 feet of the house. On the night of December 22, Mrs. Sturges was awakened at 2 a. m. by the screaming of her neighbor, Mrs. Peterson, who had opened her back door and found her back yard completely inundated with mud and the basement flooded. The patio and garden were ruined. Water, mud and silt ran along side the Peterson and Sturges' houses on both sides, and into and through the Peterson basement. The former drainage ditch and the catch basin had been obliterated by the slide. The mud and water flow continued for several days. There was

mud and water in the Peterson basement for three weeks. Several other basements were also flooded. Mrs. Feist testified that the resulting dampness destroyed $900 worth of accounting supplies in her husband's basement work room; some furniture was also damaged. The back yard of the Arnold property was also covered with mud and water. An out door fireplace was cracked, the terrace damaged, and stairs loosened from the house. Because of the damage, the plaintiff Arnold reduced the rent for his property.

By the middle of December, some of the plaintiffs consulted attorneys and wrote to the defendant. The plaintiff Peterson's letter was not answered. The defendant did have his men shovel some of the material back to the base of the slope. After the slide of December 21, defendant's men put one row of sandbags behind the Peterson house. This was insufficient protection, and after being up all night fighting the mud and debris, the plaintiff Peterson put up two more rows of sandbags. The sandbags remained until March. On December 30, the Petersons contacted John Harney (the defendant's vice-president in charge of complaints), who promised to do something and take care of all damage. The next day the debris was removed from the Peterson yard, and some railroad ties and sacks filled with mud were placed at the base of the hill by the defendant's men. The plaintiff, Tennenbaum also talked to John Harney by telephone and was told that the situation would be remedied by planting the slope. On December 22, Mrs. Tennenbaum talked to Charles L. Harney, who told her that he had already spent $20,000 on the men picking up things or repairing back yards and that was all. The same day John Harney came to the site and assured Mrs. Tennenbaum that there would be no more trouble because drainage had been installed on Dalewood Drive.

Hugh Stone, the tenant of the Kurchinski property, testified that in the early part of November a torrent came down the fill between the Kurchinski and Campbell properties. The patio floor and retaining wall of the Kurchinski house were broken; the garage door was useless for several months because of the torrent of mud and water flowing by; there was slipping in the back part of the house, and the basement was flooded. The water was diverted from the basement but continued to run along both sides of the Kurchinski and Peterson houses until March. For several Sundays, people came to the neighborhood to look at the waterfalls. Stone telephoned the defendant and asked for aid. His request for help went

unheeded and the debris was never removed from his back yard.

The worst mud and water condition at the Tennenbaum residence occurred on January 7. The plaintiff Tennenbaum obtained some sandbags. The defendant never came to clean up the Tennenbaum property as promised. In February 1956, the defendant's men dug a slight drainage ditch, smaller than the original ditch, behind the plaintiffs' properties. To the date of the trial no other protection had been provided by the defendant other than this ditch and the railroad ties placed at the front of the slope behind the properties of the plaintiffs.

■ Defendant assigns as the first error of the trial court, the instructions relating to nuisance. Defendant contends that the pleadings and proof presented only the issue of negligence. The complaint alleged that the defendant created a fill on his adjoining property, and in so doing caused surface water to be diverted from its natural course onto plaintiffs' property, mud and rock to obstruct existing drainage facilities, and mud and rock to flow onto plaintiffs' properties to their damage, including deprivation of the use, comfort and enjoyment of portions of their property. Conduct of this kind has long been recognized in this state as the creation and maintenance of a nuisance. (*Spaulding* v. *Cameron*, 38 Cal.2d 265 [239 P.2d 625] ; *Portman* v. *Clementina Co.*, 147 Cal.App.2d 651 [305 P.2d 963] ; *Rhodes* v. *San Mateo Inv. Co.*, 130 Cal. App.2d 116 [278 P.2d 447] ; *Herzog* v. *Grosso*, 41 Cal.2d 219 [259 P.2d 429].) The prayer sought "[j]udgment that said hillside as currently maintained constitutes a nuisance requiring its abatement. . . ." The complaint clearly raises the issue of nuisance as defined in Civil Code, section 3479. Plaintiffs' counsel commented at length on this theory of the case at the trial. Even if the complaint were based on a single theory of negligence, the doctrine that the plaintiff may recover only on the theory of his complaint is not followed in this state. (39 Cal.Jur.2d 118.) Nor can it be denied under the above facts, that the nuisance issue was developed by the evidence and therefore a proper subject for instructions. (*Arundel* v. *Turk*, 16 Cal.App.2d 293 [60 P.2d 486].)

■ Defendant next argues that it was error for the trial court to fail to qualify its nuisance instructions that no nuisance may be found in the absence of finding that the defendant was guilty of negligence, intentional wrongdoing, recklessness, or was engaged in an ultrahazardous activity, and that at the very least it cannot be determined upon which

theory the jury acted. We will deal first with this latter point. The uncontroverted evidence established that the defendant failed to comply with section 4112 of the city building code. His negligence, therefore, was established as a matter of law. (*Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581 [177 P.2d 279].) ▪ While a nuisance and liability therefor may exist without negligence, the torts of negligence and nuisance may be, and frequently are, coexisting and practically inseparable. (*Calder* v. *City & County of San Francisco*, 50 Cal.App.2d 837 [123 P.2d 897].) ▪ Defendant's contention is that the jury was instructed that he was absolutely liable without fault. However, the jury was not so instructed. The court instructed the jury that the burden of proof was upon the plaintiffs to prove by a preponderance of the evidence "that the defendant Harney Company was negligent and that such negligence was a proximate cause of injury to such plaintiff, or to prove to you by a preponderance of the evidence that the defendant's use of its land as shown by the evidence constitutes a nuisance. . . ." Nuisance was correctly defined in the language of the Civil Code. An identical contention was rejected by this court (Division I) in *Portman* v. *Clementina Co., supra*, 147 Cal.App.2d 651 at page 656. Nor does it appear that the defendant requested any qualifying instructions.

Defendant, relying on *Gallin* v. *Poulou*, 140 Cal.App.2d 638 [295 P.2d 958], (which held that liability for trespass was not absolute) argues that the same rule be applied to this case. However, in that case the court pointed out at page 644 that strict liability is imposed in cases involving nuisance. ▪ Furthermore, it is well settled in this state that an owner of land may not do even nonnegligent acts on his property with impunity where they create a nuisance as to his neighbor. (*Shields* v. *Wondries*, 154 Cal.App.2d 249 [316 P.2d 9].) ▪ As pointed out in that case, a nuisance need not grow out of acts of negligence, but may be the result of skillfully directed efforts—efforts which may be skillfully directed toward accomplishing the desired end, but may not have due regard for the rights of others. Defendant apparently disregards the fact that the evidence also establishes his negligence. In this case, it can easily be said that the torts of nuisance and negligence are coexisting and practically inseparable. (*Calder* v. *City & County of San Francisco, supra.*) ▪ Defendant further argues that the court erred in instructing the jury on the doctrine of liability for surface

waters, as the total volume of water was not increased and as the rule is not applied to city lots in this state. ██ In the recent case of *Andrew Jergens Co.* v. *City of Los Angeles,* 103 Cal.App.2d 232, 235 [229 P.2d 475], the rule was stated as follows:

"The legal principle governing the disposition of surface waters is simple and well established. It was stated in *Heier* v. *Krull,* 160 Cal. 441, 444 [117 P. 530], as follows: 'Every landowner must bear the burden of receiving upon his land the surface water naturally falling upon land above it and naturally flowing to it therefrom, and he has the corresponding right to have the surface water naturally falling upon his land or naturally coming upon it, flow freely therefrom upon the lower land adjoining, as it would flow under natural conditions. ██ From these rights and burdens, the principle follows that he has a lawful right to complain of others, who, by interfering with natural conditions, cause such surface water to be discharged in greater quantity or in a different manner upon his land, than would occur under natural conditions. This is the settled law of this state. (Citing cases.)' " See also *Motzer* v. *Paoli,* 110 Cal.App.2d 141 [242 P.2d 91].

██ The evidence here established that before 1955, a natural ravine brought the water from the upper slopes of Mount Davidson to the area in the rear of the plaintiffs' properties. There, the water spread out in a fan shaped manner into a sheet flow so that the water was dispersed in a shallow depth over a wide area. Any excess had since 1932 been easily absorbed by the drainage ditch and catch basin. As a result of defendant's operations, the area was stripped of vegetation, and the east end of the fill obstructed the natural ravine and channeled the flow of water into a narrow channel. There was testimony that while the fill intercepted some of the water coming down the slope, the removal of vegetation could increase the total runoff by as much as five or six times. The instruction was properly based on this evidence. A similar instruction relating to city property was upheld in *Portman* v. *Clementina Co., supra; Andrew Jergens Co.* v. *City of Los Angeles, supra,* and *Los Angeles Brick etc. Co.* v. *City of Los Angeles,* 60 Cal.App.2d 478 [141 P.2d 46].)

██ Defendant further argues that the court erred in refusing its proffered "act of God" instruction, relating to the severe rainfall of December 1955. Defendant was permitted to introduce into evidence certified copies of local climatological data for November and December 1955 and

January 1889, which showed it was the wettest December since 1889. Many witnesses commented on the severity of the rainfall. One witness testified that while a large amount of water precipitated, the significant factor from the drainage point of view was the intensity of the rain, and that this was not so unusual. ██ Furthermore, it has been held that a rainstorm which is merely of unusual intensity is not an "act of God." (*Mitchell* v. *City of Santa Barbara*, 48 Cal.App.2d 568, 572 [120 P.2d 131].) The evidence indicates that plaintiffs' loss occurred over a period of time from the early Fall of 1955 to March 1956. ██ As pointed out in *Newman* v. *City of Alhambra*, 179 Cal. 42, at 44-45 [175 P. 414], "The owner of property who by unwarranted physical means provides for a change in the drainage of his land so that another must thereby suffer injury may not attribute the logical consequences of his engineering to an act of God." ██ The evidence in this case permits no inference that an "act of God" was the sole proximate cause of plaintiffs' loss.

██ Defendant next argues that the court erred in instructing the jury that exemplary damages were recoverable without proof of malice in fact. The instruction in question reads in part as follows:

"You are instructed, however, that such punitive and exemplary damages can only be granted where the act complained of and proved was the result of wilful misconduct, which is defined as that reckless indifference to the rights of others which is tantamount to an intentional violation; where the misconduct shows such entire want of care as justifies the jury in believing that a party charged with negligence or nuisance has been guilty of conscious indifference to the consequences, then it may be said that the defendant was guilty of oppression, fraud, or malice.

"In order to support an award of punitive or exemplary damages against the defendant, it is not incumbent upon any plaintiff to establish that the defendant acted with the actual intent of injuring such plaintiff. Such damages may be awarded upon a showing by a preponderance of the evidence that the defendant, without actual intent to cause harm, nevertheless intentionally performed an act so unreasonable and dangerous that he knew or should have known that it was highly probable that harm would result. Such an act is designated by the law as wanton and reckless misconduct and it justifies an award of punitive damages."

Civil Code, section 3294, provides that exemplary damages

are recoverable where the defendant has been guilty of oppression, fraud, or malice, express or implied. The malice contemplated by this section is malice in fact. The phrase "express or implied" has reference only to the evidence by which malice is established. (*Davis* v. *Hearst,* 160 Cal. 143 [116 P. 530]; *Wolfsen* v. *Hathaway,* 32 Cal.2d 632 [198 P.2d 1].) The applicable principles are stated in 14 California Jurisprudence 2d, pages 810 and 811, section 176:

"An award of exemplary damages in an action for damages for injuries inflicted by the defendant's malicious act, can be made only if the plaintiff can show that malice in fact, as distinguished from malice in law, existed with respect to the defendant's act. The distinction between malice in fact and malice in law is substantial. Malice in fact, or actual malice, denotes ill will on the part of the defendant, or his desire to do harm for the mere satisfaction of doing it. Malice in law, on the other hand, is merely a legal fiction; it is that form of malice which the law presumes, either conclusively or disputably, to exist on the production of certain designated evidence. Malice in fact cannot be presumed; its existence must be found as a fact by the jury, although it may be proved either by direct evidence of declarations, or by an inference drawn from the acts or conduct of the defendant. While the elements of malice which is essential to a recovery of exemplary, or punitive damages is sometimes called 'express malice', 'actual malice', 'real malice', or 'true malice', it is always, in the last analysis, malice of only one kind—the malice of evil motive."

 When these principles are applied to the facts of the instant case, it is quite apparent that there are sufficient facts from which a jury could conclude the existence of malice in fact. The defendant's correspondence with the superintendent of public works shows a wilful intention not to comply with the requirements of the building code, and the deliberate commission of an unlawful act which injured the plaintiffs. (It may be noted, parenthetically, that from the deliberate commission of such an act, the law conclusively presumes the existence of malice in fact, Code Civ. Proc., § 1962.) There is also the evidence relating to response of the defendant's employees to the complaint of some of the plaintiffs, as well as defendant's repeated assertions that he need not and would not comply with the requirements of the

building code. There is much more here than a mere failure of the defendant to make repairs after repeated requests, as in *Spencer* v. *San Francisco Brick Co.*, 5 Cal.App. 126 [89 P. 851]; *Gombos* v. *Ashe*, 158 Cal.App.2d 517 [322 P.2d 933], cited by the defendant, merely held that intoxication of an automobile driver was not a malicious act within the purview of Civil Code, section 3294.

The next question is whether the above quoted instruction, particularly the portion which states that wanton and reckless misconduct justified an award of punitive damages was prejudicial to the defendant. The courts of this state have long recognized that punitive damages are recoverable for an area of tortious conduct more culpable than negligence, but falling short of intentional conduct. ■ In *Dorsey* v. *Manlove*, 14 Cal. 553, the court stated at page 556: ". . . where the trespass is committed from wanton or malicious motives, or a reckless disregard of the rights of others, or under circumstances of great hardship or oppression, the rule of compensation is not adhered to, and the measure and amount of damages are matters for the jury alone." Also, see *Russell* v. *Dennison*, 45 Cal. 337; *Lyles* v. *Perrin*, 119 Cal. 264 [51 P. 332]; *McConnell* v. *Quinn*, 71 Cal.App. 671 [236 P. 200]; *Donnelly* v. *Southern Pac. Co.*, 18 Cal.2d 863 [118 P.2d 465].) ■ We conclude therefore that the instruction in question did not constitute prejudicial error.

Defendant next argues that the compensatory damages were so excessive as to indicate that the verdict was the result of passion or prejudice. The verdict as to each of the plaintiffs awarded the following damages:

> *Mrs. Kurchinski, No. 281 Juanita Way*
>
> Property damages .....................$ 625.00
> Exemplary damages ................... 1,000.00
>
> *Mr. & Mrs. Arnold, No. 287 Juanita Way*
>
> Property damages .....................$ 475.00
> Exemplary damages ................... 2,000.00
>
> *Mr. & Mrs. Peterson, No. 283 Juanita Way*
>
> Property damages .....................$ 700.00
> Other compensatory damages ............ 6,500.00
> Exemplary damages ................... 2,000.00
>
> *Mr. & Mrs. Sturges, No. 285 Juanita Way*
>
> Property damages .....................$ 215.00
> Other compensatory damages ............ 6,500.00
> Exemplary damages ................... 2,000.00

*Mr. & Mrs. Feist, No. 289 Juanita Way*

Property damages ......................$ 200.00
Other compensatory damages ............ 6,500.00
Exemplary damages .................... 2,000.00

*Dr. & Mrs. Tennenbaum, No. 295 Juanita Way*

Property damages ......................$ 200.00
Other compensatory damages ............ 6,500.00
Exemplary damages .................... 2,000.00

No issue is raised as to the amount of the property or exemplary damages awarded, or the verdicts as to the owner plaintiffs who did not reside on the property, Mrs. Kurchinski and the Arnolds. The court instructed the jury that only those plaintiffs who resided on the property could recover damages for interference with their use and enjoyment thereof. As to the other plaintiffs, the court instructed the jury that it could not award damages for future injury or loss of market value but only such amounts as would reasonably compensate the plaintiffs for damages arising from interference with their rights of comfortable use of their properties, including any mental anguish, distress in body or mind, or other impairment of use and enjoyment.

 Defendant contends that there was no evidence upon which a jury could base damages for the use and enjoyment of real property. However, as indicated above, each of the plaintiffs testified as to his fear and mental anguish during the winter of 1955-1956. Some of the plaintiffs spent nights protecting their homes. Each of the plaintiffs was deprived of the use and enjoyment of his back yard and garden. A number of basements were flooded and not usable for months. Although there was evidence of physical damage to the plaintiffs' properties, such evidence was not necessary to the recovery of damages caused by nuisance. They were entitled to recover for the personal discomfort and annoyance. (*Dauberman* v. *Grant*, 198 Cal. 586, 590 [246 P. 319, 48 A.L.R. 1244] ; *McIvor* v. *Mercer-Fraser*, 76 Cal.App.2d 247 at 253 [172 P.2d 758].) The plaintiffs were entitled to recover damages for the loss of enjoyment, the anxiety and mental distress caused by the nuisance created and maintained by the defendant is an element of loss of enjoyment. (*Herzog* v. *Grosso*, 41 Cal. 2d 219, 225 [259 P.2d 429] ; *Alonso* v. *Hills*, 95 Cal.App.2d 778 [214 P.2d 50].) We cannot agree with the defendant that there is here a double recovery which requires that either the damages or the injunction be set aside. Furthermore,

the award of the jury approved by the trial judge (by his failure to reduce the amount of damages on the motion for a new trial) is conclusive here, ''unless the result of the deliberations of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice and passion. . . .'' (*Eldridge* v. *Clark & Henery Const. Co.*, 75 Cal.App. 516, 536 [243 P. 43]; *Gist* v. *French*, 136 Cal.App.2d 247 [288 P.2d 1003]; *Lawson* v. *Town & Country Shops, Inc.*, 159 Cal.App.2d 196 [323 P.2d 843]; *State Rubbish Collectors Assn.* v. *Siliznoff*, 38 Cal.2d 330 [240 P.2d 282]; *Finney* v. *Lockhart*, 35 Cal.2d 161 [217 P.2d 19].)

Defendant further argues that there was error in the issuance of the mandatory injunction requiring affirmative acts on the part of the defendant to abate a nuisance. Defendant urges that the court was influenced and guided by the jury's determination as to the existence of a nuisance. We cannot agree. The record of the equitable proceedings indicated that the court patiently heard a great deal of additional testimony. This evidence is in itself sufficient to establish the creation and maintenance of a nuisance by the defendant. It was established that defendant's building permit had been issued conditioned on defendant's compliance with building code, section 4112. The uncontroverted evidence established that defendant had not complied with the building code requirements as to providing proper drainage and submitting a written report of a soils engineer on the compaction of the fill. The defendant argued he was not required to comply with the building code. One witness testified that defendant's construction of the fill was not made in accordance with standard practice, and that the slope was steeper than is usual in the Bay Area. Defendant's witness testified that the fill was safe against sliding, ''even though in some places it was not compacted as much as we would like.'' The court appointed an expert (accepted by both parties) to make tests of the fill and submit the required compaction report. This expert testified that he found vegetable matter in the fill, and that this was not common practice with respect to residential fills. The expert also found that the compaction of the fill did not meet the standard set by the building code. He concluded that the surface of the fill was not stable, and that there was not enough evidence to warrant a conclusion as to the internal stability of the fill. Expert witnesses for both sides examined and commented upon the report and recom-

mendations made by the court's witness. Defendant's engineer Hutchinson testified that he would not certify that the fill was safe, but would certify that the fill was not unsafe. Plaintiffs' expert testified that the fill would probably fail because of unequal compaction, and a poor foundation. The court also questioned all of the expert witnesses at great length as how the plaintiffs' properties could best be protected. The court also heard conflicting evidence of appraisers as to the market value of the plaintiffs' properties; the effects of defendant's activities on such value, and the effect of various preventive measures on the market value.

The findings of fact indicate that the court considered the voluminous evidence fairly and impartially. The injunction merely ordered the defendant to comply with building code, section 4112. We can see no reason for setting aside the injunction.

Defendant's final allegation of error on appeal is addressed to the order striking his cross-complaint against the city and county of San Francisco. Defendant argues that the city is a necessary party under Code of Civil Procedure, section 442, as under the theory of *Spangler* v. *San Francisco,* 84 Cal. 12 [23 P. 1091, 18 Am.St.Rep. 158], the city is liable for damages caused by the flooding due to a defective sewer. In that case the city neglected to repair one of its storm sewers on a city street. The evidence here, however, clearly indicates that the city owns no easement between the property of the defendant and the properties of the plaintiffs. The defendant's property lies between the plaintiffs' and the city's. The drainage ditch easement, along the rear of the plaintiffs' properties does not belong to the city. The catch basin was located at the south line of the Sturges property, 100 feet south of Juanita Way. There is not a scintilla of evidence to support the defendant's contention that the defective city sewer caused the damage to the plaintiffs' properties.

Code of Civil Procedure, section 442, at the time of the filing of the cross-complaint (September 1956) did not authorize the filing of a cross-complaint against a stranger to the action. (*Metropolitan etc. Co.* v. *Margulis,* 38 Cal.App.2d 711 [102 P.2d 459].) As said in *Atherley* v. *MacDonald, Young & Nelson,* 135 Cal.App.2d 383, 387-388 [287 P.2d 529] : ". . . the test for a cross-complaint against a new party is more stringent than that governing cross-claims against the plaintiff or codefendants. Under Code of Civil Procedure, section 389, the stranger must be a party necessary

to a complete determination between the original parties.''
 Defendant has not brought himself within the provisions of section 389. The court did not err in concluding that it could determine the controversy between the plaintiffs and the defendant without prejudice to the rights of the city. Nor was there any prejudice to the defendant, as he is free to bring an independent action against the city. (*Metropolitan etc. Co.* v. *Margulis*, 38 Cal.App.2d 711 [102 P.2d 459].)

No prejudicial error appearing in the record, the judgment, decree and order of the lower court must be affirmed.

Judgment, decree and order affirmed.

Draper, J., and Martinelli, J. pro tem.,* concurred.

On December 8, 1958, the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied January 14, 1959.

---

*Assigned by Chairman of Judicial Council.